UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
UNITED STATES OF AMERICA,                                          :
                                                                   :      **17-CR-434 (ARR)**
     -against-                                                     :
                                                                   :      **Not for electronic or print**
JOSE OSVALDO MELENDEZ-ROJAS,                                       :      **publication**
ROSALIO MELENDEZ-ROJAS,                                            :
ABEL ROMERO-MELENDEZ, et al.,                                      :      **Opinion & Order**
                                                                   :
                          Defendants.                              :
                                                                   :
-------------------------------------------------------------------X

ROSS, United States District Judge:

On March 13, 2020, Jose Osvaldo Melendez-Rojas ("Jose Osvaldo"[1]), Rosalio

Melendez-Rojas ("Rosalio"), and Abel Romero-Melendez ("Abel") (collectively,

"defendants") were convicted of all counts for which they were charged in an eighteen-

count indictment, including alien smuggling conspiracy, conspiracy to transport minors to

engage in prostitution, sex trafficking conspiracy, and related substantive counts. Jury

Verdict, Court Exh. 6 ("Verdict Sheet"), ECF No. 221; Superseding Indictment, ECF No.

43. Jose Osvaldo, Rosalio, and Abel have each filed a motion for a judgment of acquittal

pursuant to Federal Rule of Criminal Procedure 29. Mot. for Acquittal Rule 29 by Jose

Osvaldo Melendez-Rojas, ECF No. 228 ("Jose Osvaldo's Br."); Mot. to Set Aside Verdict

---

[1] I have referred to defendants by their first name throughout this opinion because several
defendants in this case share the same or similar last names, which could create
confusion.

1

by Rosalio Melendez-Rojas, ECF No. 230 ("Rosalio's Br."); Mot. for Acquittal Rule 29, Mot. for New Trial R. 33 by Abel Romero-Melendez., ECF No. 225 ("Abel's Br."). Abel also moves for a new trial, pursuant to Federal Rule of Criminal Procedure 33, alleging that the government failed to disclose Jencks Act and Fed. R. Evid. 404(b) material and permitted a witness to introduce false evidence. Abel's Br. 4. The government opposes all of defendants' motions. Govt Br., ECF No. 231. For the reasons set forth below, the motions are denied.

## STANDARD OF REVIEW

### I.      Rule 29 Motion for a Judgment of Acquittal

Under Rule 29, a defendant can move for a "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In deciding a Rule 29 motion, the court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)

(citing *Guadagna*, 183 F.3d at 129). The court must credit "every inference that the jury might have drawn in favor of the government[,]" *United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006) (internal citation and quotation marks omitted), and "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury," *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000); *see also United States v. Sheehan*, 838 F.3d 109, 119 (2d Cir. 2016) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)); *U.S. v. Anderson*, 747 F.3d 51, 63–64 (2d Cir. 2014) ("'Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury's assessments.'" (quoting *United States v. Rea*, 958 F.2d 1206, 1221–22 (2d Cir. 1992))).

I may, however, "overturn a conviction based on a credibility determination . . . when a witness's testimony was incredible as a matter of law." *U.S. v. Griffin*, 194 F.3d 808, 817 (7th Cir. 1999) (quoting *United States v. Fiore*, 178 F.3d 917, 924 (7th Cir. 1999)). For testimony to be considered incredible as a matter of law or unbelievable on its face, the defendant must show that "'it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all.'" *Id.*, 194 F.3d at 817 (quoting *United States v. Alcantar*, 83 F.3d 189 (7th Cir. 1996)); *see also U.S. v. Dugue*, 763 F. App'x 93, 96 (2d Cir. 2019) (summary order) (rejecting defendant's sufficiency challenge because it is the jury's role to evaluate a witness's credibility, provided his testimony is "not incredible on its face, or does not

3

defy physical realities." (quoting *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012))); *U.S. v. Robinson*, 749 F. App'x 35, 37 (2d Cir. 2018) (summary order) (same); *U.S. v. Steele*, 178 F.3d 1230, 1236 (11th Cir. 1999) ("'[F]or testimony of a government witness to be incredible as a matter of law, it must be unbelievable on its face' and must relate to 'facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature.'" (quoting *U.S. v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) *cert. denied*, 522 U.S. 1133 (1998))). Accordingly, a defendant seeking a judgment of acquittal on the ground that the evidence was insufficient bears a "heavy burden." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006).

## II.     Rule 33 Motion for a New Trial

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Id.* (citing *U.S. v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). Although the trial court has broader discretion to grant a Rule 33 than a Rule 29 motion, the authority must be exercised "'sparingly' and "in 'the most extraordinary circumstances.'" *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

When considering a Rule 33 motion, a trial judge is "entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *Sanchez*, 969 F.2d at

4

1413 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). However, "it long has been [the Second Circuit's] rule that trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'" *Sanchez*, 969 F.2d at 1413–14 (quoting *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982), *cert. denied*, 459 U.S. 1174 (1983)). Only in "exceptional circumstances," where the testimony is "patently incredible or defies physical realities," may the court "intrude upon the jury function of credibility assessment." *Id.* at 1414; *see also Ferguson*, 246 F.3d at 133–34. "Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful[.]" *Sanchez*, 969 F.2d at 1414. Rather, examining the totality of the evidence, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* 1414–15 (holding that a trial judge erred in granting a new trial because "insignificant discrepancies" in police officers' testimony were insufficient to "overrule the findings of the jury regarding credibility[,]" and even if the testimony were perjured, "the jury probably would [not] have acquitted[ the defendant.]").

## DISCUSSION

The court assumes the parties' familiarity with the proceedings at trial and my previous Opinion and Order denying defendant Francisco Melendez-Perez's motion for a judgment of acquittal pursuant to Rule 29. April 10, 2020 O&O, ECF No. 232. Accordingly, I will discuss only the evidence relevant to the resolution of the instant motions.

## I.    Jose Osvaldo's Rule 29 Motion for a Judgment of Acquittal is Denied.

Following a two-week trial, the jury convicted Jose Osvaldo of all thirteen counts with which he was charged in the indictment: alien smuggling conspiracy; conspiracy to transport minors to engage in prostitution; sex trafficking conspiracy; sex trafficking of Veronica, Fabiola, and Maria Rosalba; alien smuggling of Fabiola, Maria Rosalba, and Delia; sex trafficking of a minor, Delia; transportation of a minor, Delia, to engage in prostitution; money laundering conspiracy; and distribution of the proceeds of a prostitution business. Verdict Sheet 1, 2, 3, 5, 6–7, 8, 9, 10, 11. Jose Osvaldo moves for acquittal on every count, but makes substantive arguments with regard to Counts Five, sex trafficking of Veronica, and Eight, sex trafficking of Maria Rosalba. Jose Osvaldo's Br. His motion is denied.

### a.    Count Five: Sex Trafficking of Veronica

Jose Osvaldo's argument that I must overturn his conviction as to Count Five because Veronica's testimony was "incredible on it[s] face" is unavailing. *See* Jose Osvaldo's Br. 2. In support of his contention that Veronica is not credible, and thus that his conviction of trafficking her cannot be sustained, Jose Osvaldo highlights two portions of her testimony where, he alleges, she lied. *Id.*

First, Jose Osvaldo maintains that Veronica lied when she testified at trial that he, rather than his twin, Jose Miguel, kidnapped her sister. *Id.* 2; *see* Trans. 1406:1–23. She testified that he returned her sister when she called Jose Miguel and threatened to report

him to the police. *Id.*; *see* Tr. 1406:10–23. Although Ms. Kellman[2] cross-examined Veronica extensively on this portion of her testimony, comparing it to government reports summarizing her past statements, Veronica did not alter her testimony at trial. Tr. 1410:2–1414:20, 1418:3–1421:2, 1430:9–25. Further, Ms. Kellman and Mr. Golub highlighted what they viewed as this inconsistency in their respective closing arguments to the jury. Tr. 1569:20–1570:22, 1584:14–21.

Second, Jose Osvaldo argues that Veronica lied about crossing the U.S.-Mexico border with Maria Rosalba, who crossed in 2010, nearly three years after Veronica. Jose Osvaldo Br. 2; *see* Tr. 1447:23–25; Govt Exh. 339, 341 (documenting two of Maria Rosalba's border crossing attempts on July 18, 2010 and July 24, 2010, respectively); Govt Exh. 378 at 4. Although Veronica originally testified that she crossed the border with Maria Rosalba, she revised her testimony when she resumed the stand the next day, explaining that she was mistaken and crossed the border with another woman associated with the conspiracy, "El Checha's [Jose Osvaldo's] wife." Tr. 1356:10–16, 1380:25–1381:9, 1382:11–25. She reiterated her revised testimony on cross-examination. Tr. 1448:6–8.

Jose Osvaldo argues that "[t]his glaring error in her testimony had obviously been picked up by the Government overnight," apparently alleging misconduct on the government's part. Jose Osvaldo's Br. 2. Mr. Golub cross-examined her extensively on this portion of her testimony, even asking her outright whether the government spoke with

---

[2] Counsel for Jose Osvaldo's co-defendant and twin, Jose Miguel Melendez-Rojas.

7

her the previous night. Tr. 1448:6–1454:13; *see also* Tr. 1570:23–1571:25 (arguing in closing that Veronica's inconsistency with regard to the border crossing indicates that she was lying). She denied speaking with the government after the first day of her testimony, denied telling agents in a prior interview that Maria Rosalba crossed the border with her, and maintained that Maria Rosalba had, in fact, not crossed the border with her. Tr. 1448:6–17, 1450:4–10, 1452:19–23, 1454:10–13.

Jose Osvaldo infers from Veronica's testimony that she was lying on the stand, and thus, is untrustworthy, but that is far from the only inference supported by the trial evidence. In considering a Rule 29 motion, I am "obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court." *United States v. Florez*, 447 F.3d 145, 154–55 (2d Cir. 2006) (citing *U.S. v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003)); *see also U.S. v. Kaufman*, 2014 WL 2048198, at *5 (rejecting defendant's arguments that "largely depend on drawing inferences from disputed evidence in [defendant's] favor[,]" because while "those inferences may well be permissible, . . . they are not compulsory[.]").

The testimony of other victim-witnesses corroborated Veronica's description of the Melendez family's sex trafficking business. *See* April 10, 2020 O&O 13–14 (outlining how victim-witnesses corroborated each other when describing practices of the conspiracy). For example, several of them were instructed to repackage multiple condoms into one for use during a prostitution shift. Tr. 462:8–12, 645:18–20, 741:5–12, 1258:15–16, 1390:5–7.

They gave fifty percent of their earnings to their delivery driver for each shift, and the other fifty percent to a defendant. Tr. 240:6–10, 466:24–467:2, 492:12–17, 645:15–22, 743:3–8, 14–16, 803:17–19, 1387:17–19. They were subjected to physical violence, insults, and/or threats to compel their cooperation. Tr. 207:16–24, 237:4–7, 239:4–15 (Daisy); Tr. 390:11, 437:17–22, 506:7–14 (Maria Rosalba); 625:4–5, 642:16–20, 653:16–19 (Fabiola); Tr. 811:9–13, 902:6–7 (Delia); Tr. 1261:25, 1278:6, 1279:20–21 (Diana); Tr. 1382:21–25, 1386:11–16 (Veronica); *see* April 10, 2020 O&O 11. They were made to work when they were menstruating, and instructed to insert tampons or sponges into their vaginas to disguise that fact. Tr. 238:12–14, 497:21–25, 1393:5–9. Delia and Veronica both testified that they lived in the same apartment around 2010, and Delia testified that Veronica worked in prostitution. Tr. 814:6–19; 1384:3–10.

The jury had ample opportunity to consider Mr. Golub and Ms. Kellman's arguments that Veronica's testimony was not credible, but did not credit them. *See U.S. v. Jean*, 19-CR-0123 (S-2) (JS), 2020 WL 70921, at *4 (E.D.N.Y. Jan. 7, 2020) ("At the outset, '[t]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury[,] not in a motion for a judgment of acquittal.'" (quoting *U.S. v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012)); *U.S. v. Kaufman*, No. 13 Cr. 411–02(JMF), 2014 WL 2048191, at *5 (S.D.N.Y. May 19, 2014) (rejecting defendant's arguments which "amount[ed] to little more than rearguing points that were made to, and rejected by, the jury."). Here, the jury determined that Veronica's testimony was trustworthy, and I have no basis to override its judgment.

9

### b. Count Eight: Sex Trafficking of Maria Rosalba

Likewise, Jose Osvaldo's argument that Maria Rosalba's testimony is not credible is insufficient to overturn the jury's verdict as to Count Eight. *See* Jose Osvaldo's Br. 3–4. The jury had the opportunity to consider these arguments at trial and rejected them. *See* Tr. 561:12–570:24, 578:12–579:24, 585:14–586:22, 587:2–589:4, 589:21–591:21, 602:6–603:23, 606:15–607:14 (relevant portions of Mr. Golub's cross-examination of Maria Rosalba); 1559:20–1569:17 (relevant portion of Mr. Golub's closing argument). In my Opinion & Order dated April 10, 2020, I explained that there was ample evidence produced at trial to support the jury's determination that Jose Osvaldo was guilty of Count Eight, Sex Trafficking of Maria Rosalba. *See* April 10, 2020 O&O 4–8. I also described sections of Maria Rosalba's testimony that were corroborated by other victim-witnesses. *Id.* at 7, 9, 10–11, 13–14. That reasoning applies here, as well. Therefore, I must defer to the jury's judgment as to Maria Rosalba's credibility, the weight of her testimony, and the proper inferences to be drawn from her testimony.

### c. All Other Counts

Although Jose Osvaldo urged me to overturn the verdict as to all counts against him, he made no specific arguments pertaining to any other counts. *See* Jose Osvaldo's Br. 1, 2. Because I find no justification for overturning the verdict as to the remaining counts, his motion is denied.

## II. Rosalio's Rule 29 Motion for a Judgment of Acquittal is Denied.

At trial, Rosalio was convicted of all thirteen counts with which he was charged in

the indictment, including: alien smuggling conspiracy; conspiracy to transport minors to engage in prostitution; sex trafficking conspiracy; sex trafficking of a minor as to Diana and Delia; sex trafficking of Veronica and Fabiola; alien smuggling of Veronica, Delia, and Daisy; transportation of a minor, Delia, to engage in prostitution; money laundering conspiracy; and distribution of the proceeds of a prostitution business. Verdict Sheet 1, 3, 4, 5, 6, 8, 9, 10, 11. Like Jose Osvaldo, Rosalio moves for a judgment of acquittal on all counts, but focuses his argument on "two of the sex trafficking counts," without specifically identifying the counts to which he is referring. Rosalio's Br. 1, 2. Later in his brief, he states that "[t]he government failed to present, through the women called as witnesses, proof beyond a reasonable doubt of Rosalio's involvement to establish the required elements in the sex trafficking or alien smuggling offenses." *Id.* at 5. Because his arguments pertain to the testimony of Daisy, Fabiola, and Delia, I assume he is challenging Rosalio's conviction as to Count Six, Sex Trafficking of Fabiola, Count Ten, Sex Trafficking of a Minor—Delia, and Count Fourteen, Alien Smuggling[3] of Daisy. Verdict Sheet 5, 7, 10–11. For the following reasons, Rosalio's Rule 29 motion is denied in its entirety.

### a.   Count Six: Sex Trafficking of Fabiola

Rosalio challenges his conviction by arguing that Fabiola's testimony is not

---

[3] Rosalio was not charged with sex trafficking of Daisy. Since a substantial portion of Rosalio's brief is dedicated to questioning the credibility of Daisy's testimony, I assume that he intends to challenge his conviction as to Count Fourteen, alien smuggling of Daisy. Rosalio's Br. 2–4; Verdict Sheet 10–11.

credible, and thus the government did not present sufficient evidence for a rational jury to find him guilty. Rosalio's Br. 4–5. I find that it was reasonable for the jury to determine that Fabiola's testimony was credible, and her testimony considered together with that of the other victim-witnesses in this case and the government's exhibits provide ample support for Rosalio's conviction on Count Six.

First, Rosalio argues that Fabiola's "behavior[,]" which indicated that she was in a relationship with Rosalio, undercuts her assertion that she was trafficked by him. *Id.* at 4. As evidence of their relationship, he notes that two other women, Elizabeth and Colombia, were also in a relationship with Rosalio, were jealous of Fabiola's relationship with him,[4] and Colombia assaulted Fabiola as a result. *Id.*; *see* Tr. 670:7–9, 13–21, 698:17–19, 699:10–24, 700:7–16. Additionally, Rosalio argues that Fabiola's testimony is not credible because she returned to him after escaping, allegedly indicating that he did not force her into prostitution or subject her to abuse.[5] Rosalio's Br. 4. *See also* Tr. 1610:2–1613:3 (asserting in closing argument that Fabiola's testimony was not credible).

---

[4] I found no testimony by Fabiola that Elizabeth was jealous of her, and Mr. Dunn cited none.

[5] On direct examination, Fabiola testified that to leave Rosalio, she saved some money and rented a room. Tr. 670:3–12. Rosalio found her one week later in the park. Tr. 671:2–6. Rosalio told Fabiola to return with him, and thinking that he would never leave her alone and that she "had no way out[,]" she complied. Tr. 671:8–12. Rosalio subsequently left for Mexico, and when he arrived there, Fabiola told him she would have nothing more to do with him. Tr. 671:13–23. He threatened her and her family, but she did not speak to him again. Tr. 671:23–672:7, 14–17. Ultimately, whether Fabiola was forced to return to Rosalio after her initial escape is a question of fact for the jury to decide.

As I noted with regard to Jose Osvaldo's arguments (see Part I.a above), Rosalio presents one possible inference that the jury could draw from Fabiola's testimony, but not the only inference. It is simply untrue that the presence of a relationship between Fabiola and Rosalio or her subsequent return to him, whether voluntary or not, undercuts her testimony that he trafficked her. I must credit "every inference that the jury might have drawn in favor of the government[,]" *United States v. Temple*, 447 F.3d at 136–37 (citing *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999), and "may not substitute [my] own determinations of credibility or relative weight of the evidence for that of the jury." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000); *see also U.S. v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("'[W]hen testimonial inconsistencies are revealed on cross-examination, the jury [i]s entitled to weigh the evidence and decide the credibility issues for itself . . . .'" (quoting *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009), *cert. denied*, 558 U.S. 965 (2009))); *U.S. v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) ("[W]e defer to a jury's assessments with respect to credibility, conflicting testimony, and 'the jury's choice of the competing inferences that can be drawn from the evidence[.]'" (quoting *U.S. v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001), *abrogated on other grounds by U.S v. Huezo*, 546 F.3d 174 (2d Cir. 2008))). Thus, because a rational jury could find that Fabiola's testimony that she was trafficked by Rosalio was credible, there is no basis to override the jury's determination. There is ample evidence to sustain Rosalio's conviction on to Count Six.

### b.   Count Ten: Sex Trafficking of a Minor—Delia

Rosalio makes a nearly identical argument in his motion to overturn his Count Ten conviction, which I also reject. He argues that Delia's testimony was "incredible and evasive," and thus, that the jury's verdict must be overturned. Rosalio Br. 5. In this regard, he argues first that Delia answered "I don't remember" approximately 165 times during her testimony when asked a question by a defense attorney. *Id.*; *see, e.g.,* Tr. 944:20–22, 945:18–946:7. He also points out that Delia could not remember the name associated with her Facebook account. Rosalio's Br. 5; Tr. 945:15–22. Nor did she attempt to escape prostitution by utilizing alternative exits out of clients' apartment buildings. *Id.* Finally, she did not remember whether she took the subway or another form of transportation to visit the beach or Rockefeller Center.[6] *Id.*; Tr. 953:15–18.

None of these aspects of her testimony, singly or in combination, justifies setting aside the jury's verdict. Again, the jury had the opportunity to consider them when determining whether Delia's testimony was credible, and a reasonable jury could easily find that it was. *See U.S. v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("'It is the province of the jury and not of the court' to determine whether a witness who may have been 'inaccurate, contradictory and even untruthful in some respects' was nonetheless 'entirely credible in the essentials of [her] testimony.'" (quoting *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021 (1970))); *see* tr. 1613:20–1615:13

---

[6] I found no testimony by Delia regarding her transportation to Rockefeller Center, and Mr. Dunn cited none.

(asserting in closing argument that Delia's testimony was not credible). Additionally, although Delia was the primary witness against Rosalio as to Count Ten, aspects of her testimony were corroborated by other victim-witnesses and the government's exhibits. For example, as previously discussed, each of the six victim-witnesses testified that she was subjected to physical abuse or threats, and often, both, at the hands of the co-conspirators. *See* April 10, 2020 O&O 11. They all worked in prostitution across multiple states. *Id.* at 7. Several of them testified that they were instructed to repackage the condoms for each shift into one, and referred to condoms as "chocolates." *Id.* at 13. Delia and Maria Rosalba were recruited at the same time, in similar ways, by defendants, and attempted to cross the U.S.-Mexico border together. *Id.* at 8–10. Plainly, a reasonable jury could find Delia credible, and convict Rosalio on Count Ten.

### c.    Count Fourteen: Alien Smuggling of Daisy

Rosalio maintains that Daisy's testimony was not credible, and thus, that his conviction on Count Fourteen cannot be sustained. Rosalio's Br. 2–5. Alien smuggling in this context is defined as "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law[.]" 8 U.S.C. § 1324(a)(1)(A)(iv). In addition to finding Rosalio guilty of smuggling Daisy, the jury found that defendant's violation was "for the purpose of private financial gain[.]" Verdict Sheet 10–11; *see* Jury Instr. 27, 58. I instructed the jury that defendant could be convicted of Count Fourteen if he aided and abetted another in the commission of that crime. Jury Instr. 57–58.

15

i.   *First Element: Encourage or Induce an Alien to Come to, Enter, or Reside in the United States*

The first element requires the government to prove that the defendant "encouraged or induced an alien to come to, enter, or reside in the United States in violation of law." Jury Instr. 49. "To 'encourage' means to instigate, convince, help, or advise an alien to come to the United States or to stay in this country. To 'induce' means to bring about, affect, cause, or influence an alien" to do the same. *Id.* The government adduced sufficient evidence for the jury to find that Rosalio helped Daisy come to and enter the United States by paying her illegal border crossing fees.

On direct examination, Daisy testified that Fabian[7] made the arrangements for their first attempt to cross the U.S.-Mexico border illegally, which his cousin, Rosalio, paid for. Tr. 199:9–16, 201:8–18, 202:1–5. They were not able to cross the border. Tr. 203:6–7. Rosalio and [Fabian's] sisters paid for Fabian and Daisy to cross the border illegally again, but again they failed. Tr. 215:22–216:17. Daisy and Fabian successfully crossed the border on their third attempt, which was also paid for by Rosalio and Fabian's sisters. Tr. 225:12–226:12, 227:11–13. When they arrived in New York, Fabian called Rosalio, who told them to come to his apartment in Queens. Tr. 228:12–21. They proceeded to Queens and stayed with Rosalio for a period of time. Tr. 228:22–229:2.

---

[7] On December 27, 2019, Fabian Reyes-Rojas pleaded guilty to Counts Three and Thirteen of the Superseding Indictment, sex trafficking conspiracy and sex trafficking of Daisy, and consequently was not a co-defendant at the instant trial. Min. Entry dated December 27, 2019, ECF No. 144; Superseding Indictment, ECF No. 43.

16

Rosalio argues that Daisy's testimony was "incredible[,]" "undercut[ting] her credibility." Rosalio's Br. 4. In this regard, he cites to several aspects of her testimony, allegedly demonstrating that she cannot be believed. For example, he notes, she alleged that she did not realize that Fabian was involved in prostitution, although she had grown up in Tenancingo and was a college student; she did not advise U.S. border patrol agents that she feared returning to Mexico, and she asserted that the agents did not read her her rights; she did not attempt to escape Fabian while being forced to work in prostitution in Chiapas or Mexico City; she believed Fabian's lie that she would work in a restaurant in New York; and she did not seize perceived opportunities to escape Fabian for a period of time in New York.[8] *Id.* 2–4. The noted testimony does not impugn Daisy's credibility.

Mr. Dunn had the opportunity to highlight these alleged inconsistencies to the jury during cross-examination and his closing argument. *See* Tr. 297:3–303:4, 305:3–311:6, 313:3–317:2, 321:2–328:10 (cross-examination by Mr. Dunn); Tr. 1596:1–1608:15 (Mr. Dunn's closing argument, making the same arguments regarding Daisy's credibility advanced in his Rule 29 brief). The jury evaluated Daisy's credibility and chose to believe her testimony, despite Mr. Dunn's arguments. *See U.S. v. Jean*, 2020 WL 70921, at *4. There is no basis to override the jury's judgment, as Daisy's testimony amply supports a finding that Rosalio helped her to cross the border illegally, satisfying the first element.

---

[8] Daisy stopped working in prostitution in January 2015, when a friend helped her to leave Fabian. *See* 290:13–291:3.

        *ii.    Second Element: Knowledge or Reckless Disregard of Illegal Entry*

        The second element of alien smuggling requires the government to prove that "the defendant knew, or acted in reckless disregard of the fact that the alien he encouraged or induced would come to, enter or reside in the United States in violation of law." Jury Instr. 50. This element is satisfied here, as well.

        Daisy testified that Rosalio paid at least part of her smuggling fee across the U.S.-Mexico border not once, but three times. Additionally, it was common practice for the co-defendants to loan each other money to transport women across the border illegally. Like Daisy, Maria Rosalba described Rosalio loaning money to Jose Osvaldo to pay for her illegal border crossing. Tr. 454:9–12, 456:5–457:1. Following a similar pattern, Jose Osvaldo loaned Rosalio the money necessary for Fabiola's illegal crossing. Tr. 641:2–7. From this evidence, a rational jury could infer that Rosalio knew or recklessly disregarded the fact that Daisy was entering the United States illegally.

        *iii.    Alien Smuggling for the Purpose of Private Financial Gain*

        The jury determined that Rosalio smuggled Daisy for the purpose of private financial gain. Verdict Sheet 11. I advised the jury that "'[p]rivate financial gain' is profit or gain in money or property specifically for a particular person or group. There is no requirement that the defendant actually received some financial gain, although, of course, you may consider evidence that the defendant did receive financial gain in deciding whether he acted for that purpose." Jury Instr. 27.

        In my April 10, 2020 Opinion & Order, I upheld this portion of Francisco's

18

conviction, finding that the evidence presented at trial was sufficient to support the jury's determination. *See* April 10, 2020 O&O 19. Specifically, I referenced various victims' testimony that they were required to divide their prostitution earnings between their delivery drivers and a defendant. *Id.*; *see* Tr. 240:6–10, 466:24–467:2, 492:12–17, 645:15–22, 743:3–8, 14–16, 803:17–19, 1387:17–19. A portion of that money was wired to defendants' associates in Mexico. *Id.*; *see* Tr. 240:13–21, 274:10–25, 275:6, 17–24, 605:2–14, 896:4–19; Gov't Exh. 412. Delia testified that at one point, defendants Francisco, Rosalio, Osvaldo, Miguel, and Abel pooled their prostitutes' earnings in a "tanda," or savings club. Tr. 795:20–796:11.

Additionally, as I have already discussed (*see* Part II.c.ii above), it was common practice for the co-defendants to loan each other money to transport women across the border illegally. Several victim-witnesses testified, however, that the defendants did not appear to work themselves. *See* tr. 275:25–276:2 (Daisy never saw Abel working); tr. 252:2–7, 17–25, 253:2–6 (Daisy explaining that Fabian did not work, but would "go to the park" with his co-defendants, including Francisco and Rosalio); tr. 487:18–21 (Maria Rosalba testifying that Jose Osvaldo never brought any money home); tr. 562:1–2 (Maria Rosalba explaining that Jose Osvaldo "always worked out because he didn't do anything else"); Tr. 804:23–10 (Delia testifying that Rosalio did not appear to have a job, but often played soccer and worked out in the park).

Considering the totality of the evidence and drawing all inferences in favor of the government, a rational jury could have determined both that Rosalio smuggled Daisy

19

across the border, and that he did it for the purpose of private financial gain.

### d.  All Other Counts

Rosalio made no specific arguments pertaining to any other counts. *See* Rosalio's Br. 1, 2. Because I find no justification for overturning the verdict as to the remaining counts, his motion is denied.

## III.   Abel's Rule 29 Motion for a Judgment of Acquittal is Denied.

Abel was convicted of all five counts for which he was charged, including alien smuggling conspiracy, conspiracy to transport minors to engage in prostitution, sex trafficking conspiracy, sex trafficking of a minor—Diana, and illegal reentry. Verdict Sheet 2, 3, 4–5, 12. He moves for a judgment of acquittal on all counts but illegal reentry, alleging that the government's evidence was insufficient to sustain his convictions. Abel's Br. 1. For the following reasons, I deny Abel's motion in its entirety.

### a.   A rational jury could find that Diana's testimony was credible.

Abel contends that portions of Diana's testimony are incredible or false, and thus, that her testimony cannot support Abel's convictions. Abel's Br. 3. Because I find that Abel's argument lacks factual and legal basis, I will not override the jury's evaluation of her credibility.

First, Abel asserts that several facts about which Diana testified that were not included in reports of the government's prior interviews with her are incredible as a matter of law because "[s]uch extreme negligence on the part of law enforcement defies the 'laws of nature.'" Abel's Reply 2; *see also* Abel's Br. 3. For example, on direct examination,

20

Diana testified that she attempted to cross the U.S.-Mexico border with Jose Miguel and Abel three or four times in 2006. Tr. 1224:5–15, 1238:7–22, 1239:8–11. Before one of the border crossing attempts, Abel instructed her to tell immigration officials a fake birth date. Tr. 1240:3–10. Eventually, she and Jose Miguel successfully crossed the border, but Abel was caught. Tr. 1244:14–1245:6. On cross-examination, she admitted that she "never told the [government] agents . . . that Abel assisted [her] in trying to memorize a fake birthday." Tr. 1321:21–24. In a similar vein, Diana testified on direct and cross-examination that Abel watched Jose Miguel raping her within a few days of arriving in New York City. Tr. 1323:18–25. When shown a prior government report omitting that fact, she acknowledged that it was an important detail that she would have told government agents. Tr. 1328:3–10. She also testified that she saw Abel repackaging condoms and going over prostitution accounts, a fact that she did not previously disclose to the government. Tr. 1265:22–23, 1266:7–14, 1328:11–24.

Second, Abel contends that discrepancies in Diana's timeline render her testimony incredible as a matter of law. Abel's Br. 3. Principally, Diana testified on direct examination that Abel witnessed Jose Miguel raping her the first night that she returned from a prostitution shift, but also testified on cross-examination that Abel arrived in New York City three months after she did. Tr. 1261:23–1262:14, 1324:14–18. On redirect, Diana clarified that the rape witnessed by Abel occurred after he arrived in the United States, and noted that she was raped multiple times. Tr. 1342:20–1323:4.

Neither the alleged discrepancies in timeline nor the omissions from prior

government reports render Diana's testimony "incredible," such that I would set aside the jury's determination in this case. A reasonable jury could find Diana's testimony credible despite minor inconsistencies in her timeline and between her various statements, especially considering the amount of time that had passed and the traumatic nature of the conduct in this case. *United States v. Jean*, 2020 WL 70921, at *4 (E.D.N.Y. 2020) ("[M]inor discrepancies, after the passage of time, do not warrant a judgment of acquittal."). Run-of-the-mill credibility challenges should be addressed to the jury on cross-examination and in closing argument; this is not an "extreme case" meriting post-trial relief from a verdict. *See U.S. v. Robinson*, 749 F. App'x at 37 (finding that witness's testimony was not incredible as a matter of law when his central assertions were not corroborated, he was combative on the stand, and there was an inconsistency in his testimony); *see also U.S. v. Truman*, 688 F.3d at 139–40 (holding that a witness who breached his cooperation agreement, had a criminal record and history of drug and alcohol abuse, refused to testify about certain topics, and whose attorney admitted that he perjured himself in state court was not incredible as a matter of law). Abel asserts that Diana's testimony is distinguishable from that of *Robinson* and *Truman* because she described events that were "physically impossible[,]" "outside the 'laws of nature[,]'" and that "defie[d] physical realities," but he cites to no legal authority justifying that claim. Abel's Reply 3. It is certainly physically possible that Abel witnessed Diana's rape and other brutalities by Jose Miguel once he arrived in New York, as Diana clarified on redirect. Likewise, the omission of facts in a summary report written by a federal agent violates no law of nature of which

22

I am aware.

Furthermore, several other of Diana's purported "inconsistencies" are not necessarily inconsistencies at all. *See* Abel Reply 2. For example, Diana testified on direct examination that she did not know what happened to Carmen, a woman attempting to cross the border with Diana, Miguel, and Abel, after their failed border crossing attempt. Tr. 1245:7–9. Later, she testified on cross-examination that *Abel told her* that Carmen went back to Veracruz. Tr. 1323:12–14.[9]  While the jury is certainly entitled to consider both aspects of her testimony when evaluating her credibility, this testimony by no means necessitates a finding that she was even inconsistent, let alone incredible as a matter of law. Similarly, Diana's testimony on direct examination that Abel arrived a "short time" and "not long" after her in New York does not necessarily contradict her subsequent testimony that Abel arrived "three months" later. *See* Abel's Reply 2; Tr. 1263:24–1264:2; 1323:6–8, 1324:14–18. Nor is it "physically impossible" that Abel gave her a cell phone to use for prostitution, even though he arrived in New York approximately three months after she began working as a prostitute.[10]

---

[9]  Abel also argues that her testimony regarding Carmen's return to Veracruz "supports the inference that [Abel] did not force women across the border." Abel's Reply 2. Evidence that Abel helped Diana to cross the border, whether or not she was forced, can support his conviction of sex trafficking of a minor, either directly or as an aider and abettor. *See* Jury Instr. 19–21, 43, 44–45. Additionally, Abel presents one of several possible inferences that the jury can draw from the testimony; it is the jury's role to decide between competing inferences.

[10]  When describing her escape from Miguel in 2007, Diana explained that Miguel contacted her on a cell phone that Abel had given her for prostitution—a fact that Abel

23

Additionally, Diana's testimony regarding the age of Cristina, a prostitute working for Abel, was not incredible as a matter of law. Abel's Br. 3; Abel's Reply 3; *see* Tr. 265:2–7 (Daisy); Tr. 821:14–17 (Delia). Diana testified that Cristina was "very young" in 2006 and that Abel described her as fourteen or fifteen years old, which is the age Diana believed she was. Tr. 1264:3–14, 1267:19–22. Her estimate of Cristina's age was corroborated by Daisy, who testified that in 2014, Cristina appeared to be twenty or twenty-one years old. Tr. 263:2–6, 264:12–14, 269:14–15. Although two NYPD property forms indicate that Cristina was twenty-four years old in 2012, and thus was approximately eighteen years old in 2006, these forms are not conclusive evidence of her age. Govt Exhs. 217, 218. This is an issue of credibility for the jury, and Mr. Hueston addressed it in his closing argument. Tr. 1717:1–1718:13.

Neither does a review of the government's § 3500 material support Abel's contention that the government elicited false or misleading testimony from Diana at trial as to Cristina's age. While some § 3500 materials indicate that Cristina was older than Diana testified, at least one other report suggests that she was a minor at the time. *See, e.g.*, Govt Exh. 3500-Cristina-1 at 2 ("C[ristina] stated that she was born on in 1987[.]"); Govt Exh. 3500-Cristina-2 at 2 (indicating that Cristina was seventeen years old in 2005); Govt Exh. 3500-Diana-7 at 4 ("One time while doing laundry at the laundry mat D[iana] spoke to [Cristina], who informed her that she was sixteen years old[.]").

---

contends is impossible, because he was not in the United States when she was first forced to become a prostitute. Tr. 1276:8–21, 1280:2–3, 1280:11–16; Abel Reply 2.

24

Similarly, Abel has not demonstrated that Diana lied on the stand with regard to when Cristina came to New York City. On direct examination, Diana testified that Cristina arrived at her Queens apartment with Abel, approximately three months after her. Tr. 1262:9–14, 1263:21–1264:2. The government introduced evidence of a wire transfer from Cristina in Queens to Abel in Mexico in February 2006, before Diana was in the United States. Govt Exh. 412. A reasonable jury could interpret this evidence to indicate that Diana was lying or that she was accurately describing when Cristina first arrived at her apartment, regardless of when Cristina arrived in Queens more generally. Mr. Hueston also raised this point in his closing argument, but the jury rejected it. Tr. 1718:16–1719:24.

Like the other victim-witnesses in this case, portions of Diana's testimony were corroborated by the other witnesses and the government's exhibits (*see* Part I.a above). *See, e.g.*, Govt Exh. 379 at 1, 5 (documenting three of Diana's failed border crossing attempts with Jose Miguel and Abel). Considering the totality of the evidence, a rational jury could have found Diana's testimony credible. Because Abel has not shown that any of Diana's testimony is incredible as a matter of law, the "testimonial inconsistencies" discussed here are within the province of the jury, not the court on a motion for acquittal. *O'Connor*, 650 F.3d at 855 ("'[W]hen testimonial inconsistencies are revealed on cross-examination, the jury [i]s entitled to weigh the evidence and decide the credibility issues for itself . . . .'" (quoting *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009), *cert. denied*, 558 U.S. 965 (2009))).

25

### b. Abel was not "merely present" for the commission of Counts One through Four, and the government presented sufficient evidence to convict him.

Abel alleges that "[t]he case against him is circumstantial in the extreme. There is simply insufficient evidence to convict him of Counts One through Four. At best, he was merely present when crimes may have been committed or associated with others who may have committed crimes." Abel Br. 3. Abel fails to point out any particular shortcoming in the government's evidence, however, besides challenging the credibility of the victim-witnesses and claiming that evidence corroborating their testimony is insufficient. *See* Abel's Reply 3–4. The requirement that I draw all inferences in the government's favor when considering the evidence pursuant to a Rule 29 motion "'is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *U.S. v. Lombardozzi*, 491 F.3d 61, 67 (2d Cir. 2007) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). I find that there is ample evidence that Abel engaged in sex trafficking of a minor, Diana, and conspired to engage in alien smuggling, sex trafficking, and transportation of a minor for the purpose of prostitution.

With regard to Abel's sex trafficking conspiracy conviction, Daisy described Abel's participation in the family sex trafficking business in 2014. For example, Daisy testified that she shared an apartment with Abel, his sister Alicia, Alicia's partner, Raul, Cristina, and her trafficker, Fabian, from approximately February to December 2014. Tr. 263:2–6,

26

264:2–20. Cristina, Abel's prostitute, gave Daisy numbers for prostitution delivery drivers, which she recorded in a notebook. Tr. 265:19–24. The co-conspirators in the apartment ordered condoms together, and when they arrived, they would divvy them up for the prostitutes to use for work. Tr. 268:4–7. Cristina "gave up all the money she earned," pooling it into a savings society run by Rosalio's friends[11]; Daisy never saw Abel work while living with him. Tr. 274:6–13; 275:25–276:2. Daisy also accompanied Alicia to wire money to Abel on three occasions. Tr. 274:14–25, 275:2–6.[12]

Additionally, Daisy overheard Fabian, her trafficker, and Abel discussing the family prostitution business. They said that Lizbeth, Abel's prostitute, had moved to North Carolina and was making more money there, allowing Abel to purchase two cars with her earnings. Tr. 289:4–13, 18–290:3. They discussed moving themselves and their prostitutes to North Carolina to increase their revenues. Tr. 290:4–12.

In addition to being partially corroborated by Delia, Daisy's testimony is corroborated by the evidence found during the search of the apartment at 103-44 52nd Avenue, where Delia testified that Abel lived with Cristina. Tr. 832:10–11. On July 12,

---

[11] As previously discussed (*see* Part II.a above), Delia testified that the defendants, including Abel, pooled the money that their prostitutes earned into a "tanda," corroborating Daisy's testimony. Tr. 795:20–796:11.

[12] Abel's brief incorrectly argues that evidence that Alicia wired Abel money does not further the charged conspiracies against him, because he was not charged with money laundering or distribution of the proceeds of a prostitution business. Abel's Br. 2. However, the wire transfers are evidence that an agreement to engage in sex trafficking existed, and that Abel "participated in the conspiracy willfully, with knowledge of its unlawful purpose, and in furtherance of its unlawful purpose." Jury Instr. 17–18.

2017, federal agents conducted a search of that apartment, where they found condoms, notebooks containing delivery drivers' numbers, and "chica cards" used for marketing delivery prostitution services. Tr. 1075:10–17, 1087:2–1090:17, 1091:17–1092:13, 1101:4–17. One of the notebooks had the name "Lizbeth" written on the front cover. Tr. 1089:15–20; Govt Exh. 208. Alicia and Cristina were both in the apartment when the search occurred, and Francisco and Raul returned to the apartment during the search and were apprehended. Tr. 1077:23–25, 1078:5–11, 1079:21–1080:7. This evidence, considered in the context of all of the evidence presented at trial, is sufficient to show that Abel was not "merely present" while others engaged in sex trafficking conspiracy. *See* Jury Instr. 31–41.

Similarly, a rational jury could find that Abel conspired to transport a minor to engage in prostitution. Jury Instr. 27–31, 42–45. I have already discussed portions of Diana's testimony in depth (*see* Part II.a above). For example, Diana testified that she was accompanied by Abel and Jose Miguel on her attempts to cross the U.S.-Mexico border, a fact corroborated by border crossing records indicating that the three of them were apprehended together thrice. Govt Exh. 378 at 1, 5 (summarizing border crossing records in a demonstrative exhibit). Abel coached her to recite a fake birth date at the border. Considering the evidence presented at trial in its totality, the government introduced sufficient evidence to satisfy Counts Two and Four.

Lastly, the government presented sufficient evidence that Abel conspired to smuggle an alien, and that he did so for the purpose of private financial gain. Jury Instr.

22–27. In addition to the evidence already discussed, Abel knew that Lizbeth did not enter the United States legally, because he was apprehended twice attempting to illegally cross the U.S.-Mexico border with Lizbeth in June 2012. Govt Exh. 378 at 5. Abel and Lizbeth signed a lease together for an apartment in Charlotte, North Carolina in 2017. Tr. 1113:2–1115:7; Govt Exh. 200. As previously discussed, Abel bragged about purchasing cars for himself using the proceeds of Lizbeth's prostitution in North Carolina.

### IV.    Abel's Rule 33 Motion for a New Trial is Denied.

In addition to his Rule 29 motion, Abel also moves for a new trial pursuant to Rule 33, asserting that the government failed to disclose Jencks Act and 404(b) materials and that the government allowed Diana to introduce false testimony. 18 U.S.C. § 3500; Fed. R. Evid. 404(b); Abel's Br. 4–6; Abel's Reply 4–5. Specifically, he claims that the government did not disclose unspecified "notes and reports from its meetings with Diana from February 12, 2020 through March 11, 2020, documenting her contemporaneously made statements" that Abel watched Miguel rape her, gave her a cell phone, told her to memorize a fake birth date, and conducted "accountings" relating to the prostitution business. Abel's Reply 4. His motion is denied.

None of the evidence referenced here is 404(b) evidence. Fed. R. Evid. 404(b) ("Evidence of a crime, wrong, or other act . . . may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant . . . the prosecutor must provide reasonable notice of the general nature of any such evidence that the

29

prosecutor intends to offer at trial[.]"). Rather, all of the evidence Abel cites is direct evidence of his participation in the conspiracy counts and the sex trafficking of Diana, a minor. Accordingly, his assertion that the government failed to appropriately disclose 404(b) evidence is rejected.

Additionally, Abel has not carried his burden of demonstrating that the government failed to meet its disclosure obligations under § 3500. *See U.S. v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) ("The defendant bears the burden of proving that he is entitled to a new trial under Rule 33[.]"). In essence, he asserts that because Diana testified to facts that were not included in the government's § 3500 disclosures, the government must have failed to produce materials following its last documented meeting with her. Without identification of any specific materials that the government failed to disclose, this bare assertion is insufficient to justify granting a new trial.

Furthermore, as I have previously discussed (*see* Part III.a above), neither Diana's testimony nor that of the other victim-witnesses was "'patently incredible or defi[ed] physical realities.'" *U.S. v. McCourty*, 562 F.3d at 476 (quoting *U.S. v. Sanchez*, 969 F.2d at 1414). Nor is there any basis to believe that the government permitted Diana to introduce false testimony. Thus, Abel has not shown that "exceptional circumstances" exist which would justify setting aside the jury's verdict to avoid a "manifest injustice." *Id.* at 476–77; *U.S. v. Ferguson*, 246 F.3d at 134 ("'There must be a real concern that an innocent person may have been convicted.'" (quoting *U.S. v. Sanchez*, 969 F.2d at 1414)).

30

Finally, in his Reply, Abel asserts for the first time that the government "suppressed inculpatory statements" in violation of its *Brady* obligations. Abel's Reply 5. A *Brady* violation requires the defendant to prove that "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *U.S. v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Here, Abel has not identified any exculpatory or impeachment evidence that the government failed to disclose. *Id.* Therefore, I find that his *Brady* claim has no basis in fact or law. Accordingly, his Rule 33 motion for a new trial is denied.

## CONCLUSION

For the foregoing reasons, defendants Jose Osvaldo Melendez-Rojas, Rosalio Melendez-Rojas, and Abel Romero-Melendez's Rule 29 motions for a directed verdict of acquittal are denied. Abel Romero-Melendez's Rule 33 motion for a new trial is also denied. Finally, there is no basis to conduct a post-trial evidentiary hearing to determine whether the government failed to disclose § 3500 and 404(b) material. *See United States v. Ortega*, No. 00 CR 432 (DLC), 2001 WL 1588930, at *8 (S.D.N.Y. Dec. 13, 2001), *aff'd on other grounds* 82 F. App'x 717 (2d Cir. 2003), *vacated by* 543 U.S. 1103 (2005). SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      May 4, 2020
              Brooklyn, New York

31