UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

UNITED STATES OF AMERICA

                                                  17 Cr. 434 (ARR)

                    -against-

ABEL ROMERO-MELENDEZ,

                                  Defendant.

------------------------------------------------------------------------- x


**MEMORANDUM OF LAW IN AID OF
SENTENCING FOR DEFENDANT
ABEL ROMERO-MELENDEZ**


MICHAEL O. HUESTON, ESQ.
*Attorney for Defendant*
16 Court Street, Suite 1800
Brooklyn, New York 11241
(718) 246-2900

JACQUELINE CISTARO, ESQ.
*Associate Counsel for Defendant*


Dated:      Brooklyn, New York
             August 6, 2021

## I.    Introduction

Defendant Abel Romero-Melendez raises the following issues related to his appropriate sentence.

A jury convicted Mr. Romero-Melendez on five counts: Count One (conspiracy to smuggle aliens between 2006 and July 2017); Count Two (conspiracy to transport minors between August 2006 and April 2014); Count Three (conspiracy to commit sex trafficking between January 2009 and July 2017); Count Four (trafficking Jane Doe # 1, Diana, a minor, between August 2006 and March 2007); and Count Eighteen (illegal reentry).

The minimum and maximum terms of imprisonment are: on Count One, a maximum of 10 years, as per 8 U.S.C. §1324(a)(1)(A)(v)(I) and 8 U.S.C. § 1324(a)(1)(B)(i); on Count Two, a minimum of 10 years with a maximum of life, as per 18 U.S.C. § 2423(e) and 18 U.S.C. § 2423(a); on Count Three, a minimum of imprisonment of 15 years with a maximum of life, as per 18 U.S.C. § 1594(c), 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(b)(1); on Count Four, a minimum of imprisonment of 15 years with a maximum of life, as per 18 U.S.C. § 1591(a)(1), 18 U.S.C. § 1591(a)(2), and 18 U.S.C. § 1591(b)(1); and on Count Eighteen, a maximum of two years, as per 8 U.S.C. § 1326(a).

The Probation Department ("Probation") asserts that Mr. Romero-Melendez's total offense level is 42 and his criminal history category of I, resulting in a guideline imprisonment range of 360 months to life.[1]

---

[1] *See* Presentence Report ("PSR") at ¶ 213.

We assert that Mr. Romero-Melendez's combined total offense level is 35 and his criminal history category is I, resulting in a guideline imprisonment range of 168 to 210 months.

Regarding supervised release, on Count One the term cannot be for more than three years, as per 18 U.S.C. § 3583(b)(2); on Counts Two, Three and Four, the terms are from five years to life, as per 18 U.S.C. § 3583(k); and on Count 18, the term is for not more than one year, as per 18 U.S.C. § 3583(b)(3).  The guideline ranges are: on Count One, one to three years, as per U.S.S.G. §5D1.2(a)(2); on Counts Two, Three and Four, five years to life, as per U.S.S.G. §5D1.2(b)(2); and on Count Eighteen, one year, as per U.S.S.G. § 5D1.2(a)(3).

We respectfully request that the Court impose the following terms of imprisonment: on Counts One and Eighteen of time served; on Count Two of 10 years; and on Count Three and Four of 15 years, with all sentences to run concurrently.

We also respectfully request that the Court impose terms of supervised release: on Counts One and Eighteen of one year; and on Counts Two, Three and Four of five years.

We also ask that no fine or Justice for Victims of Trafficking Act special assessment be imposed.

This sentence would be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. § 3553(a), considering Mr. Romero-Melendez's history and characteristics, the nature of the offense, the need to provide educational or vocational training, the need for general and specific deterrence, and the need to avoid sentencing disparities.  And as acknowledged in the PSR as a mitigating factor, "the defendant is the

product of a poverty-stricken part of Mexico, where sex trafficking is woven into the fabric of society."[2]

## II.    Comments and Objections to the Presentence Report

Mr. Romero-Melendez commented and objected to Probation's PSR.[3]   We respectfully renew our motions, comments and objections set forth below.

### A.    The Offense Conduct at Part A.

We object to the characterization and factual assertions regarding Mr. Romero-Melendez's alleged involvement in the offense conduct attributed to him at ¶¶ 9-11, 16, 20, 21, 76, 78, and 81-88.

#### 1.    ¶¶ 9-11 Background

At ¶ 9, the report states: "Although not all of the defendants were involved with the [Melendez-Rojas trafficking organization ('MR-TO') for the entire[ty] of the charged conspiracy, they were generally equal participants.  They all benefited financially from offenses, and they worked together to ensure the ongoing prostitution of the victims and money laundering of the proceeds."

We object to this characterization and note that the evidence adduced at trial does not support this conclusion.  *See generally*, Defendant's Motions pursuant to Fed. R. Crim. P. 29 and 33 at Docket, Document Nos. 225, 233 ("Defendant Post Trial Motions"), which we incorporate herein by reference.

Probation has improperly tried to foist enhancements on Mr. Romero-Melendez for conduct that he did not do, participate in, or which is not jointly undertaken criminal

---

[2]*See* ¶ 236.

[3]*See* Defendant's December 15, 2020 letter hereto at Exhibit A.

activity.  To hold him accountable for his co-defendants' actions, a district court has to make two "particularized findings": (1) "that the acts were within the scope of the defendant's agreement" and (2) "that they were foreseeable to the defendant."  *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995); *see, e.g., United States v. Cade*, 452 F. App'x 47, 49 (2d Cir. 2011) (In a case involving a violation of 18 U.S.C. § 2422(b), the court noted that: "To sentence a defendant on the basis of a coconspirator's criminal activity, the sentencing court must make particularized findings both that the conduct was 'in furtherance of the jointly undertaken criminal activity' and that it was 'reasonably foreseeable.'") (citing *Studley,* at 574).

### a.   Trial Record

It must be stressed that Cristina Sanchez Sanchez ("Sanchez"), who is also referred to as "Estephanie" and "Jane Doe # 8" and Lizbeth Castellanos Bautista ("Castellanos Bautista"), the women Mr. Romero-Melendez purportedly smuggled and sex trafficked, did not testify at trial.  The government did not bring substantive counts against him regarding these individuals.  Except for Diana (Jane Doe # 1), Mr. Romero-Melendez was not charged with any substantive counts regarding the alleged victims.  And of those individuals, only Diana, Delia (Jane Doe # 5), and Daisy (Jane Doe # 6) discussed Mr. Romero-Melendez, while Veronica (Jane Doe # 2), Fabiola M. (Jane Doe # 3), and Maria Rosalba (Jane Doe # 4) had little or nothing to say about him.

Daisy testified that Mr. Romero-Melendez was not her smuggler or sex trafficker.  Tr. 344 ("Q. Okay.  In fact, my client, Abel Romero-Melendez, didn't force you to do anything; is that fair?  A. Yes, that's correct.").  She testified about her alleged observations regarding Sanchez's involvement in prostitution.  Tr. 264-276.  She also

4

testified that she was present when his sister, Alicia Romero-Melendez, wired money for him.  Tr. 274-275.

Delia testified that Sanchez and Castellanos Bautista worked as prostitutes for Mr. Romero-Melendez.  Tr. 820-838.  Delia was not a "victim" of Mr. Romero-Melendez, and the government stipulated that in Delia's sworn statement to Mexican authorities she did not state that Mr. Romero-Melendez or Alicia Romero-Melendez were part of the sex trafficking ring that controlled her.  Tr. 972.[4]

The United States Customs and Border Protection records showed that Castellanos Bautista and Mr. Romero-Melendez attempted to cross the Mexican border together, but the jury heard no evidence about the circumstances of the crossing, and Castellanos Bautista's wire transfers showed that whatever money she sent went not to Mr. Romero-Melendez, but, to her family members.  *See* GX 412 at Exhibit A.[5] Similarly, the wire records showed that the majority of the money sent by Sanchez, approximately $61,000, went to her family.  *See* GX 412 at Exhibit B; *see also* Tr. 1066. The wired money sent to these women's family members directly rebuts the government's claim that they were forced to remit their earnings to the defendants and their co-conspirators.

Moreover, Diana lied about Mr. Romero-Melendez.  On cross-examination, we elicited that in her numerous meetings with the government she gave a very different account about Mr. Romero-Melendez's involvement in her alleged smuggling,

---

[4]*See also*, GX 3500-Delia-27 and 27-S, Detailed Statement of Events attached hereto under seal at Exhibit B, Sentencing Supplement.

[5]In this memorandum, we also refer to exhibits used in Defendant's Post Trial Motions at Document Nos. 225, 233, except where noted we direct the Court and parties to those docket entries to review those items.

transporting and trafficking.  Tr. 1321.  After being confronted with her earlier statements, Diana admitted that Mr. Romero-Melendez did not come to Queens until three months after her arrival.  Tr. 1342 ("Q. Does this document, from your meeting with the government agents, refresh your recollection that you advised them that Abel Romero-Melendez did not arrive in the United States until three months after you were in this country?  A. Yes.").  Diana's admission of when Mr. Romero-Melendez actually arrived in New York showed that he was not living with her in Queens when she was forced into prostitution, given a phone to conduct business, raped or abused.  This timeline again contradicts the government's assertion about Mr. Romero-Melendez's involvement in her prostitution.

We also showed that Mr. Romero-Melendez did not force Diana to cross illegally into the United States from Mexico and that in her prior meetings with the government she never said that Mr. Romero-Melendez helped her memorize a fake birth date.  Tr. 1321-1322.  This makes sense because Miguel would not have delegated that responsibility to him.  It was a trial fabrication.  She also admitted that in her meetings she never told the agents that she witnessed any "accounting" between Mr. Romero-Melendez and Sanchez.  Tr. 1328.  And in her earlier meetings, again, she never mentioned that Mr. Romero-Melendez was present when she was raped or abused.  *Id.*

The government tried to minimize these inexplicable variances by, essentially, blaming the note-takers or suggesting to the witness that she just left out key details for whatever reason.  Tr. 1342.  The discrepancies show that the testimony was invented and is false.  Indeed, other proof further discredits Diana's testimony, specifically the wires show that Sanchez was already in New York, as early as February 2006, and police

documents concerning her, GXs 217 and 218,[6] shows that she turned 18 years old in 2006, thus was older than Diana.  Notably, Mr. Romero-Melendez would have been approximately 19 or 20 years old during this time,[7] and because of his age and lack of maturity would not have been in a position to assert undue influence over anyone.

The wires prove that Sanchez and Mr. Romero-Melendez did not "arrive in New York" after Diana – because Sanchez was already here.  And the police documents further prove that Mr. Romero-Melendez would not have bragged about Sanchez being "14 or 15" years old in 2006.  This testimony, by Diana, was categorically untrue.

Moreover, the surprise allegation about Mr. Romero-Melendez being present when Daisy was sexually assaulted and abused, is striking because, on June 5, 2019, the defendants and defense counsel attended a reverse proffer where the government specified the evidence against each defendant.  At the reverse proffer, while evidence of sexual and physical abuse and forced abortions was proffered, the government never asserted, or even suggested, that Mr. Romero-Melendez was present during any alleged sexual assaults or beatings.  The prosecutors did not hold back.  This made sense.  Because the purpose of the meeting was to lay out the evidence so the defendants understood their trial risks.

Further, when the government filed its motions *in limine*, which dealt with notice of evidence of rape, there was no change in the anticipated proof against Mr. Romero-Melendez regarding acts of violence – none were alleged.  *See* Government's December 16, 2019 submission.  That motion was also consistent with the extradition affidavit Diana

---

[6]*See* Prisoner Property Receipt and Invoice attached hereto at Exhibit C.

[7]*See* PSR, Defendant's 1986 date of birth at p. 2.

signed, which was provided as discovery and as 3500 material.  *See* GX 3500-Diana-1 and 1-S, dated November 16, 2017.

Furthermore, the provided 3500 material shows that Diana's earlier allegations concerning Mr. Romero-Melendez are consistent with the government's reverse proffer and motions *in limine*.  *Compare* GX 3500-Diana-7 and 7A, August 12, 2016 interview; GX 3500-Diana-8, May 18, 2017 interview; GX 3500-Diana-9 and 9A, August 7, 2017 interview; GX 3500-Diana-10 and 10A, September 26, 2017 interview; GX 3500-Diana-11, November 16, 2017 interview; GX 3500-Diana-12 and 12A January 2, 2020 interview; and GX 3500-Diana-13, February 11, 2020 interview.

As can be seen from these materials, Diana claimed that Jose Miguel Melendez-Rojas ("J. M. Melendez-Rojas" or "Miguel") told her what to say at the border and that he raped her, and that the phone she used belonged to him.  Mr. Romero-Melendez was never mentioned in these details.  More importantly, there was no mention of any "accounting" she observed, or any specific comments he allegedly made in Diana's presence or at her border crossing, or that he ever provided her with a phone whatsoever.

Further, from its own meetings with Sanchez, the government knew that she contradicted key points of Diana's testimony regarding Mr. Romero-Melendez.  *Compare* GX 3500-Cristina-1 and 1A, 2 and 2A, and 3.  In their meetings, Sanchez told the prosecution that she was born in late 1987, which, again, belies the story Diana told about Mr. Romero-Melendez bragging to his co-defendants about Sanchez being underage. Sanchez also told the prosecution that Mr. Romero-Melendez did not return to Queens until November 2006, which is consistent with Diana's earliest statements about his arrival. This contradicts the compressed timetable the government elicited from Diana, and shows

he was not present when Diana was allegedly forced into prostitution, beaten, and sexually assaulted.

It is also important to point out that when the search warrant was executed and items were seized at the Flushing Queens residence, Tr. 1075, Mr. Romero-Melendez was living in Charlotte, North Carolina.  Tr. 1113, and GX 200.[8]  Further, the presence of various bills, wire transfer records, "chica cards" and notebooks in 2017 do not substantiate Diana's allegations against Mr. Romero-Melendez from ten years earlier.

In addition, the items do not corroborate that Mr. Romero-Melendez smuggled or forced women into prostitution.  The items are not contraband.  None of the individuals living in the residence, at the time of the execution of the search warrant, including Cristina Sanchez Sanchez, testified about the items.  Finally, while border-crossing records show that J. M. Melendez-Rojas, Diana and Mr. Romero-Melendez were detained at the United States-Mexican border, Diana also testified that she and Miguel eventually crossed the border without Mr. Romero-Melendez, Tr. 1237-1240, which shows that Mr. Romero-Melendez was not responsible for, or in control of, bringing her into the country.

This trial record shows that Probation's position regarding Mr. Romero-Melendez's conduct and the scope of his jointly undertaken activity is wrong and based on surmise and assumptions, and not the type of evidence a court should rely on.  *See, e.g.*, *United States v. Shonubi II*, 998 F.2d 84, 89-90 (2d Cir. 1993) (quantity of narcotics smuggled over eight trips by multiplying eight by the amount smuggled during the

---

[8]*See* portions of GX 200 attached hereto at Exhibit D and PSR at ¶¶ 193, 205.  Mr. Romero-Melendez was arrested in North Carolina.  Tr. 1458, 1459.

offense of conviction amounted only to "surmise" and "conjecture," and, thus, was impermissible). *See also United States v. Shonubi IV,* 103 F.3d. 1085, 1092 (2d Cir. 1997) (proving the quantity of drugs by statistical and economic analysis relating to drug trafficking generally, not to the defendant specifically, did not satisfy the "specific evidence" requirement); *see, e.g.*, *Simms v. U.S. Dep't of Agriculture Food Nutrition Serv.,* 860 F.2d 858, 862 (8th Cir. 1988) ("district court 'must reach its own factual and legal conclusions … and should not limit its consideration to matters previously appraised in the administrative proceeding'") (internal quotation marks omitted) (quoting *Ibrahim v. United States*, 834 F. 2d 52, 53-54 (2d. Cir. 1987)).

Clearly, Probation fails to appreciate that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d at 234 n.11 (internal quotation marks omitted). For sentencing, mere "knowledge of another participant's criminal acts" or "of the scope of the overall operation" does not make a defendant criminally responsible and it is less likely that an activity was jointly undertaken if the participants worked independently and did not "pool their profits and resources." *See Studley*, 47 F.3d at 575.

As explained by Application Note 3(B), "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, cmt. n.3(B). The Application Note instructs that a court may "consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* Moreover, even if an act of a co-conspirator was known or reasonably

foreseeable to a defendant, if it was not within the scope of the defendant's agreement, then it cannot be considered relevant conduct.  *Id.*  More is required, such as evidence that the defendant has pooled profits or resources with other participants, or has otherwise "directly tied" his success to the activities of the other.  *Studley*, 47 F.3d at 575 (citing what his now § 1B1.3, cmt. n.4, illus. (C)(iv)).  Other factors bearing on the scope of jointly undertaken activity include whether the defendant assisted not only in the execution of an illegal scheme, but in its design as well.  *See Id.* (citing cmt. n.4, illus. (C)(ii)).  Enhancements should not be applied merely because a defendant knew of a co-conspirator's criminal acts, or was "aware of the scope of the overall operation…." *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004) (discussing whether scope of agreement included murder citing *Studley,* at 575).

The "relevant inquiry is what role the defendant agreed to play in the operation, either by explicit agreement or implicitly by his conduct."  *Id.* (citing cmt. n.4, illus. (C)(vii)).  Arguably, even if Mr. Romero-Melendez knew about the abusive activities of his co-defendants that would not *per se* increase the length of his sentence.  *See, e.g., United States v. Presendieu*, 880 F.3d 1228, 1246 (11th Cir. 2018) (a defendant's "mere awareness" of being part of a larger scheme did not mean that losses independently caused by an actor of whom she was unaware were within the scope of her agreement); and *United States v. Metro*, 882 F.3d 431, 440 (3d Cir. 2018) (in an insider trading prosecution, gains realized by individuals relying on information originally revealed by the defendant were not relevant conduct if their actions were not within the scope of the activity agreed to by the defendant).   A court must make "a particularized finding" that the co-conspirator's act "was within the scope of the *specific* conduct and objectives

11

embraced by the . . . agreement." *Id.* (alteration in original) (citing *Studley,* at 575); *see, e.g.*, *United States v. Getto,* 729 F.3d 221, 234 (2d Cir. 2013) ("It is clear from a review of the transcript of the sentencing proceeding that the District Court did not make particularized findings relating to the scope of the activity or the foreseeability of the conduct of Getto, stating only that it had 'no quarrel with the [government's] conspiracy theory here from what I have read.' This terse statement does not constitute particularized findings, and compels the conclusion that the District Court committed procedural error.") (attribution and citation omitted).

To apply the enhancements, the evidence must show that Mr. Romero-Melendez agreed to the acts triggering them and that those actions were within his control. No proof was offered that Mr. Romero-Melendez created, organized, managed or gave direction to others. No proof was made that he induced, recruited or controlled any of the alleged victims. No proof was made that he pooled profits or resources. Indeed, he was not present in the United States or Queens during most of the period stated in the indictment. He was in the United States from November 2006, left at the end of 2008 with Sanchez, and did not return to the United States until approximately 2013, and then lived and worked in North Carolina from 2014 to 2017.[9]

Besides the false testimony of Diana, there is no evidence that Mr. Romero-Melendez hurt any of the women, agreed to hurt any of the women, or caused anyone to be smuggled into the country. In fact, the evidence shows that Mr. Romero-Melendez did not mistreat or control anyone, as evidence by the proof that Sanchez and Castellanos

---

[9] *See* PSR at ¶¶ 184-186, 195 (Defendant's failed border crossing and removals in 2006 and 2012). The PSR incorrectly states at ¶ 193 that Mr. Romero-Melendez returned to New York at age 19 and remained until 2014. This needs to be corrected. *See* GX 3500-Cristina-1-004 (corroborating timeline).

Bautista kept their profits for themselves and did not testify against him. There was no evidence that Mr. Romero passed along any money they made to his co-defendants or that he shared in his co-defendants' proceeds. *Cf. United States v. Stephens*, 7 F.3d 285, 288 (2d Cir. 1993) ("Evidence offered at [Stephen's] trial established that Stephens [and his co-conspirators] segregated the envelopes containing the checks from the rest of the stolen mail, opened the envelopes, and divided the contents between himself and the others."). Further, there was no evidence that Mr. Romero-Melendez possessed an "enabl[ing]" knowledge or a "high[] level" association regarding the scheme or the control of the victims. *Cf. United States v. Wahl*, 563 F. App'x 45, 51 (2d Cir. 2014) (District court found the doctor knew he was enabling each of the clinics to "engage in widespread fraud" and was associated with each of the clinics at the "highest level[.]").

Accordingly, we object to the narrative as it seeks to hold Mr. Romero-Melendez accountable for conduct he did not do or which he did not agree to jointly undertake, ask that it be stricken, and that this Court not rely on it regarding any guideline enhancement or to increase his period of incarceration.

### 2.     ¶¶ 16, 20, 21: Jane Doe #1 (Diana)

We reincorporate, reiterate and emphasize the following about Diana's false testimony.

Diana testified that she arrived at the United States-Mexican border with Miguel and met up with Mr. Romero-Melendez and a woman named Carmen, and after numerous attempts, she and Miguel successfully crossed the border, while Mr. Romero-Melendez was detained and returned to Mexico. Tr. 1237, 1244, 1245. Diana claimed that she did not know what happened to Carmen. Tr. 1245. Diana testified that she had

13

no contact with her own family, did not have a cellphone, and immediately traveled with Miguel to Rosalio Melendez-Rojas's apartment on Martense Avenue, Queens, New York.  Tr. 1246, 1247, 1261.  She claimed that a "**short time**" later Mr. Romero-Melendez arrived in Queens.  Tr. 1262-1264 (emphasis added).  She testified that the "**first night**" she worked as a prostitute, Miguel found money that she had hidden and believed she had been stealing from him, so he beat and raped her in front of Mr. Romero-Melendez and others.  Tr. 1261, 1262 (emphasis added).  Diana testified that from the day she arrived in Queens, until the day she escaped, she was forced into prostitution, and that Mr. Romero-Melendez gave her a cellphone so she could contact the drivers.  Tr. 1280, 1281.

However, on cross-examination, Diana admitted that Mr. Romero-Melendez did not arrive in New York until "**three months**" after she and Miguel arrived in Queens.  Tr. 1324 (emphasis added); *see also* GX 3500-Diana-7 and 7A.  She further admitted that she knew Carmen went back to Veracruz, Mexico (which supports our assertion that Mr. Romero-Melendez did not force women across the border or into prostitution).  Tr. 1323; *compare* GX 3500-Diana-12 and 12A.  Diana also admitted that she never told the government that anyone was present during any alleged rapes and agreed it was an **"extremely important detail"** that she would have shared with the government in her meetings.  Tr. 1323-1328 (emphasis added); *compare also* GX-3500 Diana-7 and 7A.

In contrast, Mr. Romero-Melendez's actual arrival date shows that Diana's testimony was incredible as a matter of law as it was "physically impossible" for Mr. Romero-Melendez to have been present when she was raped and abused or to have provided her with a cellphone as a means to force and/or aid her in prostitution since he

was in Mexico.  *United States v. Griffin*, 194 F.3d at 817.  By Diana's own testimony, she was forced into prostitution from day one until her escape, and she used a cellphone to contact drivers.  She told the government in May 2017: "she had a phone that **belonged to MIGUEL** and that he would always go through her phone and check her messages. When she left MIGUEL she kept his phone."  GX 3500-Diana-8 (emphasis added).  This earlier noted detail establishes the cellphone's true origin, and shows that she falsely placed Miguel's cellphone in the hands of Mr. Romero-Melendez.

Again, Sanchez's statements to the government contradict key points of Diana's testimony regarding Mr. Romero-Melendez.  *Compare* GX 3500-Cristina-1 and 1A, 2 and 2A, and 3.  In their meetings, Sanchez told the prosecution that she was born in late 1987, which belies Diana's story about Mr. Romero-Melendez bragging that Sanchez was underage.  *See also* GX 217 and GX 218; GXs 3500-Daisy-5-008 and 3500-Daisy-7-002 (showing Sanchez was born in December 1987).  Sanchez also told the government that Mr. Romero-Melendez did not arrive in Queens until November 2006, which is also inconsistent with Diana's trial testimony.  Damningly, the wire records show that Sanchez was in New York as early as February 2006, which again completely contradicts Diana's trial testimony.

The notes from Cristina Sanchez Sanchez's debriefing by federal agents confirm the same date of birth.  *See* GX-3500 Cristina-1 and 1A.  This date of birth is also listed in the notes from Daisy's government interviews.  *See* GXs 3500-Daisy-5-008 and 3500-Daisy-7-002.[10]  Therefore, Cristina Sanchez Sanchez was, at least 18 years old, when Diana claims she met her.

---

[10] Notably, HSI/New York agents also state that Cristina Sanchez Sanchez was born in 1981.  GX 3500-Daisy-7-002.

Accordingly, we object to the narrative regarding Diana, ask that it be stricken, and that this Court not rely on it regarding any guideline enhancement or to increase his period of incarceration.

3.    **¶ 76 Other Victims (Not Referenced in the Indictment) – Jane Doe # 8, Estephanie**

At trial, Diana claimed that she saw Mr. Romero-Melendez breaking up packets of condoms and "going over accounts" with Sanchez.  Tr. 1265, 1266.  However, on cross-examination she admitted that in her meetings she never told the agents that she witnessed any so-called "accounting" between Mr. Romero-Melendez and Sanchez.  Tr. 1328.  Daisy and Delia testified about their alleged observations regarding Sanchez's involvement in prostitution, but their testimony did not support the legal elements of the charged crimes either.  Tr. 264-276, 820-838.

Again, Sanchez did not testify at trial, and in the government's interview notes she did not state that Mr. Romero-Melendez ever forced her into prostitution or trafficked her, or that he committed any crimes against her.  *See* GX 3500-Cristina-1 and 1A, 2 and 2A, and 3.

Accordingly, we object to the inclusion of this uncharged conduct, ask that it be stricken, and that this Court not rely on it regarding any guideline enhancement or to increase his sentence of incarceration.

4.    **¶ 78  Money Laundering Activities**

Mr. Romero Melendez was not charged with money laundering or distributing proceeds in this case.

While Daisy testified that she was present when Mr. Romero-Melendez's sister, Alicia Romero-Melendez, wired money for him, Tr. 274, 275, the testimony did not further the convicted conduct.

The evidence proves that the wire transfer records are inconsistent with Mr. Romero-Melendez's involvement in money laundering or distributing proceeds.  Again, they show that Castellanos Bautista and Sanchez controlled their money, which directly contradicts the government's theory that Mr. Romero-Melendez's "victims" were forced to remit their earnings to him and his co-conspirators.

Accordingly, we object to the inclusion of this uncharged conduct, ask that it be stricken, and not be used in the computation of Mr. Romero-Melendez's guideline calculation or sentencing.

### 5.    ¶¶ 81-88 The Defendants' Participation (Abel Romero-Melendez)

We respectfully renew our motions, comments and objections.

### a.    Count One, The Alien Smuggling Conspiracy

We agree that U.S.S.G. § 2L1.1 provides a base offense level 12 as per U.S.S.G. § 2 L1.1(a)(3).  However, we object to the application of U.S.S.G. § 2L1.1(b)(2)(A) (3 levels) (smuggling of between 6 and 24 aliens); U.S.S.G. § 2L1.1(b)(4) (4 levels) (offense involved the smuggling of at least one minor); U.S.S.G. § 2L1.1(b)(7)(B) Application Note 4 of U.S.S.G. § 2L1.1 (4 levels) (serious bodily injury is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law); and U.S.S.G. §2L1.1(b)(8)(A) (2 levels) (victims kept in the United States by coercion and threats).

As argued, the record regarding Mr. Romero-Melendez does not support the use of these enhancements.  *Cf. United States v. Reyes*, 772 F.3d 1152 (9th Cir. 2014) (District court did not clearly err by imposing two-level sentencing enhancement for harboring unaccompanied minor aliens because it was plausible for district court to conclude that defendant could reasonably have foreseen that other members of smuggling ring might have smuggled unaccompanied minors, either by act or omission, because defendant pooled his resources and profits with other members of smuggling ring, defendant had significant role within large smuggling ring, there was lack of any screening mechanism to prevent unaccompanied minors, and defendant had intimate knowledge of circumstances in stash house); *United States v. Myung Ho Kim*, 193 F.3d 567 (2d Cir. 1999) (Evidence supported two-step increase under § 2L1.1 on grounds that offense of harboring an illegal alien involved between 6 and 25 aliens, where witnesses identified by name a total of 10 illegal aliens who had been instructed by employee acting under defendant's direction to change their names and provide false documentation in order to remain employed by defendant's garment-manufacturing business); *United States v. Miguel*, 368 F.3d 1150 (9th Cir. 2004) (Where defendants were caught smuggling group of five Mexican children and young adults, district court did not abuse its discretion by imposing sentencing enhancement for substantial risk of death or bodily injury under USSG § 2L1.1(b)(5), because children were lying down unrestrained in overloaded vehicle's trunk on very hot day; sentencing enhancement for bodily injury under § 2L1.1(b)(6) was not erroneous based upon unconsciousness of five-year-old boy); and *United States v. Andres*, 666 F. App'x 621 (9th Cir. 2016) (Defendant's sentence for harboring alien was properly enhanced for involuntary detention of victim;

use or threat of physical restraint or injury was not required, and it was not clear error to find that victim was involuntarily detained through coercion or threat and in connection with demand for payment where she was threatened with recapture if she left without permission and was told she could leave only if she paid $1000).

### b.  Count Two, The Conspiracy to Transport Minors

We object to the application of the special instruction at U.S.S.G. § 2G1.3(d), which results in a guideline calculation being included for each of the following count groups: Counts Two, Three, and Four with respect to Jane Doe # 1, and Count Three with respect to Jane Doe # 8, since Sanchez was not a victim.

### c.  Counts Two, Three and Four with respect to Jane Doe # 1

We agree that the convicted conduct references U.S.S.G. § 2G1.3.  As for Count Two, as per U.S.S.G. § 2G1.3(a)(3), the base offense level is 28 (a conviction of 18 U.S.C. § 2423(a)); and as for Counts Three and Four, as per U.S.S.G. § 2G1.3(a)(2) the baselines are 34 (a conviction of 18 U.S.C. § 1591(b)(1)) and 30 (a conviction of 18 U.S.C. § 1591(b)(2)) respectively.

We object to the application of U.S.S.G. § 2G1.3(b)(2)(B) (2 levels) (defendant unduly influenced Jane Doe # 1 to engage in prohibited sexual conduct through threats of violence against her family, and physical assaults); U.S.S.G. § 2G1.3(b)(4)(A) (2 levels) (commission of sex acts and sexual contact); and U.S.S.G. § 3A1.1(b)(1) (2 levels) (vulnerable victims).

As argued, the record regarding Mr. Romero-Melendez does not support the use of these enhancements.  *Cf. United States v. Lay*, 583 F.3d 436 (6th Cir. 2009)  (District court properly applied enhancement for undue influence of minor, under U.S.S.G. §

2G1.3(b)(2)(B), because defendant failed to rebut applicable presumption that he had unduly influenced much younger victim, district court found facts that were consistent with manipulative adult's building relationship with minor for purpose of eventual sexual activity, and involvement of minor was not impermissibly double counted element because defendant pled guilty to traveling with intent to engage in impermissible sexual conduct with minor, and district court applied enhancement for unduly influencing minor to engage in impermissible sexual conduct.); *United States v. Burnett*, 377 F. App'x 248 (3d Cir. 2010)  (Defendant's sentence for transporting individual for purpose of engaging in prostitution was properly enhanced under U.S.S.G. § 2G1.3(b)(3)(B), as evidence showed that defendant exercised "supervisory control" over minor and personally communicated by computer with individuals defendant enticed to have sex with minor); *United States v. Dean*, 238 F. App'x 320 (9th Cir. 2007)  (In sentencing defendant on his conviction of, inter alia, interstate transportation of minor with intent to engage in criminal sexual activity under 18 U.S.C. § 2423(a) and travel with intent to engage in illicit sexual conduct under § 2423(b), district court did not err by applying two-level enhancement for unduly influencing minor to engage in prohibited sexual conduct, as defendant failed to identify any record evidence sufficient to rebut presumption of undue influence established by U.S.S.G. § 2G1.3, cmt., application n. 3 when participant is at least 10 years older than minor; although defendant, who was 25 years old when he had sexual contact with 15-year-old, argued that presumption did not apply because 15-year-old minor admitted to engaging in sexual relations with individuals other than defendant, culpability under 18 U.S.C.S. ch. 117 was contingent on conduct of defendant, not minor's actions); *United States v. Pringler*, 765 F.3d 445 (5th Cir. 2014)  (District court

properly increased defendant's offense level by two based on its conclusion that defendant exerted undue influence over minor during offense based in part on minor's testimony of her fear of leaving defendant, and testimony from police officer with significant experience investigating prostitution, who explained that physical abuse of one person in presence of another could be used to control person who was watching); *United States v. Banks*, 190 F. App'x 825 (11th Cir. 2006) (District court properly applied cross-reference in USSG § 2G1.3 to use base offense level and specific offense characteristics of USSG § 2A3.1 because record showed that defendant used force to cause minor to engage in sexual act with another person; and *United States v. Simonson*, 244 F. App'x 823 (9th Cir. 2007)  (District court did not err in sentencing defendant on his conviction of intent to engage in illicit sexual conduct and attempted enticement under 18 USCS § 2423(a)–(b) because district court did not clearly err in finding that defendant had misrepresented his age in order to persuade, induce, entice, coerce, or facilitate travel of, minor to engage in prohibited sexual conduct of purposes of USSG § 2G1.3(b)(2)(A)).

We note that the Probation Department determined that the cross reference found at U.S.S.G.§ 2G1.3(c)(3) was considered since the offense involved criminal sexual abuse, but determined that the offense level resulting from the cross reference to U.S.S.G. § 2A3.1 was not greater than that determined above, so the cross reference was not utilized.  However, we believe that Mr. Romero-Melendez's offense level for Count Two, as per U.S.S.G. § 2G1.3(a)(2), is only 28 (a conviction of 18 U.S.C. § 2422(b)), so U.S.S.G. § 2A3.1 would apply and result in an offense level of 30.

21

### d.   Count Three with respect to Jane Doe # 8

We agree that this uncharged conduct references U.S.S.G. § 2G1.3, but object to its application because she is not a victim.  If applicable, U.S.S.G. § 2A3.1 would provide for a base offense level of 30, as per U.S.S.G. § 2A3.1(a)(2), but, as argued, the record concerning Mr. Romero-Melendez does not support the use of any enhancements.

### B.   ¶¶ 137, 226 Victim Impact (Abel Romero-Melendez); and Restitution at Part D. Sentencing Options

We object and refer the Court to the comments regarding our objections concerning the victims, including Jane Does # 1 and 8, and object to the imposition of restitution regarding Jane Doe # 8.

### C.   Offense Level Computation; and Guideline Provisions at Part D. Sentencing Options

We object to the offense level computation at ¶¶ 141-177, and 213.  We assert that the following is the correct guideline calculation.

¶ 141:  We agree that Counts One and Eighteen are grouped as per U.S.S.G. § 3D1.2(d).  We object to the application of the special instructions at U.S.S.G. §§ 2G1.1 and 2G1.3(d) regarding the grouping of Count Three with respect to Jane Doe # 8 because she is not a victim.

¶¶ 143-151: Count 1: Alien Smuggling Conspiracy

Mr. Romero-Melendez's offense level is 12 as per U.S.S.G. §2L1.1(a)(3).  We object to the enhancements.

<u>¶¶ 152-164: Counts 2, 3[11], and 4: Sex Trafficking of Jane Doe #1</u>

Mr. Romero-Melendez's offense level results in 34, since he was convicted under 18 U.S.C. § 1591(b)(1) with respect to Count Four.  We object to the enhancements.

As for "Count 3(b): Sex Trafficking of Jane Doe #8", as stated, we object to the inclusion of this conduct.  However, if included, the offense level would be 30, as per U.S.S.G. § 2A3.1 (a)(2).  And we would object to the enhancements.

<u>¶¶ 165-171: Count 18: Illegal Reentry</u>

Mr. Romero-Melendez's offense level is 8 as per U.S.S.G. § 2L1.2.

<u>¶¶ 171-174, 213: Multiple Count Adjustment, Combined Offense Level, Total Offense Level</u>

Counts One and Eighteen result in 0.0 levels and Counts Two, Three and Four result in 1.0 levels for a total of 1.0 Units as per § 3D1.4(a), (b) and (c).  This results in a combined total offense level of 35, and a Guidelines level of 168 to 210 months of imprisonment.

### III.  Background and Characteristics

Information relating to Mr. Romero-Melendez's background and characteristics is discussed in the PSR and his letters of support.[12]  The following draws from those materials and other items as noted.

Tenancingo, Mexico is a rural town in Tlaxcala located in southeastern Mexico where most of the population suffers from extreme poverty and substandard living – many families do not have electricity, running water, or access to proper nutrition and

---

[11] We note that the indictment does not list Counts 3(a) or 3(b), and we object to this characterization.

[12] *See* letters of support at Exhibit E.

healthcare.  Most residents do not own furniture and sleep on dirt or bare concrete floors because they do not have the luxury of even owning a mattress let alone a bed.

In Tenancingo, the main economic means of survival are farming, handcrafts and prostitution.  The extreme poverty and lack of basic human needs created the phenomenon of family-run prostitution rings, which are operated as a legitimate family business, and dates back half a century.[13]  Generations pass down the family business to their children and they are taught that prostitution is an acceptable source of income and lifestyle.  Because prostitution is legal, and widespread throughout the country, this is the norm rather than the exception.[14]  Sadly, girls are raised to become prostitutes and boys are groomed to become managers or pimps.[15]

Abel Romero-Melendez was born in 1986, in Tlaxcala, Mexico, to Juan Romero-Rosas and Sophia Melendez-Perez.  His father is a farmer, cultivating fruits and vegetables, where he works seven days a week in the sweltering heat.  Abel's mother operates a small laundry service and suffers from severe headaches due to a brain hemorrhage, high blood pressure and painful dental conditions.  Abel is the oldest of seven children.  Tragically, Abel's youngest brother was murdered at the age of 21 years old during an unprovoked argument in 2009.  Abel has no children of his own, but has four nieces and nephews.  His sister, Alicia, resides in Queens, New York, while his remaining living siblings reside in Tenancingo.

---

[13]*See* Gayle Clark, *The Mexican Town Where Nearly All Boys Grow Up to Be Pimps*, World, June 7, 2016, http://www.wng.org/sift/the-mexican-town-where-nearly-all-boys-grow-up-to-be-pimps-1617739831.

[14]*See* Prostitution in Mexico, http://en.wikipedia.org/wiki/Prostitution_in_Mexico; World Population Review, Countries Where Prostitution is Legal, http://www.worldpopulationreview.com/country-rankings/countries-where-prostitution-is-legal.

[15]*See* Gayle Clark, *The Mexican Town Where Nearly All Boys Grow Up to Be Pimps*, World, June 7, 2016, http://www.wng.org/sift/the-mexican-town-where-nearly-all-boys-grow-up-to-be-pimps-1617739831.

Abel was raised in an extremely poor family.  Many times, his family had little to no food on the table.  They survived on tortillas and beans.  He recalls often going to bed hungry.  The family home consisted of one room – with no bathroom – to be shared by nine people.  The entire family lived and slept together in the same room on the bare floor.  Abel's family did not own shoes and lacked basic clothing and personal necessities.  Somehow, they managed to survive under unimaginable conditions.

The family's severe poverty created a source of harassment by members of their community.  As the oldest sibling, Abel was required to protect his younger siblings who were often bullied.  Beginning at 10 years old, just a child himself, Abel was forced to defend his brothers and sisters from being bullied almost daily.  Abel's childhood memories are filled with great sadness.

From 1990 to 1998, Abel attended Vincente Guerrero Elementary School in Tlaxcala, Mexico.  The unbearable hunger he felt, coupled with the lack of clothing and shoes, caused him to fall behind in his studies.  Sadly, at 12 years old, Abel dropped out of school and began distributing sacks of corn in the fields of his hometown.  Abel only completed the equivalent of a 6th-grade education.

Since childhood, Abel has been employed in various jobs, including farming, fruit and vegetable distribution, house painting, auto repairs, and construction.  With no education or vocational training, Abel found it very difficult to find steady employment.  During the times he was employed, Abel often worked seven days a week to put food on the table and assist his family with basic human necessities.

Abel has maintained a very close relationship with his immediate and extended family.  By all accounts, Abel is a kind, respectful, and hard-working individual as evidenced by the letters of support on behalf of Abel's family, friends, and neighbors.

Abel's sister, Alicia, writes that her brother has a good heart and is always willing to help anyone in need.  She describes Abel's caring nature with his nieces and nephews, including playing with the children at the park, sharing a meal, and showering them with love and affection.  Alicia also explains that their own childhood was very traumatic due to their lack of food, clothing and shoes.  As the oldest child, Abel was required to work at a very young age rather than spend time in school or playing with friends.  Alicia describes her mother's ill health and father's advanced age and respectfully requests compassion and leniency on behalf of their entire family.

Likewise, Abel's youngest sister, Liliana, describes Abel as a good person who has supported the family and others in need.  She writes that he has helped her a lot.  Liliana further reports that Abel has always been very respectful and hard-working his entire life.

Rafael Romero-Melendez writes that Abel is known to be honorable and friendly throughout the community.

Abel's childhood friend, Raul Rojas, explains how difficult it is to survive in Mexico and, despite such poverty, Abel has not only helped his own family, but also his friend and his children.  He too describes Abel as a good, hard-working person.  Another childhood friend, Marin Romero Contreras, recalls nice memories from long ago and describes Abel as a good person and humble farmer.

### IV.     Offense Conduct and Adjustment to Incarceration

Mr. Romero-Melendez is a non-violent offender.  At the Metropolitan Detention Center, he has worked as an orderly, receiving outstanding performance reviews, and has completed many facility courses.[16]

### V.     18 U.S.C. § 3553(a)

This Court is not required to impose a sentence based on the Guidelines or based on any policy of the Sentencing Commission that circumvents the specific intent of Congress for individualized sentencing.  *Pepper v. United States*, 562 U.S. 476, 501 (2011).  A sentence at variance with the Guidelines is appropriate, here, because the Guidelines fail to include critical factors about Mr. Romero-Melendez's background and characteristics, which Congress mandated must be included in arriving at the sentence to be imposed.  *See* 18 U.S.C. § 3553.  When offenders' backgrounds and characteristics are ignored, marginalized, or reduced to second-class status, the goal of informative, individualized sentencing cannot be achieved.  Rather, offenders are left to the mercy of mathematical numbers that arrive at terms of incarceration with no empirical relationship to either punishment or the causes that brought them before the court.

An individual assessment that takes into account Mr. Romero-Melendez's character and background, including his lack of guidance as a youth and similar circumstances, nationality, and socioeconomic status, clearly supports that a sentence of 15 years followed by five years of supervised release is "sufficient, but not greater than necessary" to achieve the objectives of sentencing in this case.  *See* 18 U.S.C. § 3553(a)(1).

---

[16] *See* Exhibit F, Performance Review and Program Certificates.

A.    **Lack of Guidance as a Youth and Similar Circumstances, National Origin and Socioeconomic Status**

Mr. Romero-Melendez's life, like so many offenders, is one of diverted potential, and while he is not blameless, he is not responsible for the circumstances he was born and raised in, and this is a factor we respectfully ask the Court to consider in applying a variance. *See United States v. Bannister*, 786 F. Supp. 2d 617, 688-89 (E.D.N.Y. 2011) ("Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass. Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth. Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense. That the defendants were born into circumstances without such support is at the center of this tragedy.").

The Guidelines state that offenders' youth and similar circumstances are irrelevant in its departure scheme. *See* U.S.S.G. § 5H1.12 ("Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."). Of course, we are not asking for a departure, rather a variance, so this Court can act. But in asking for a variance, it is worth deconstructing the Sentencing Commission's position, as it shows why the Guidelines are so flawed.

The Sentencing Reform Act ("SRA"), enacted in 1984, created the Sentencing Commission and instructed it to promulgate Guidelines that would reconcile the multiple

purposes of punishment while promoting the goals of uniformity and proportionality.  *See* 28 U.S.C. §§ 991(b)(1)(A) and 991(b)(1)(B).  That sounds reasonable.  And under the SRA, the Commission was directed that it should "develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of Title 18, United States Code," 28 U.S.C. § 994(m), and "establish sentencing policies and practices" that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process."  28 U.S.C. § 991(b)(1)(C).  That also sounds reasonable.

However, notably absent in the Commission's mission was any focus on 18 U.S.C. § 3553(a)(1)'s mandate, which states that "in determining the particular sentence to be imposed, [the court] shall consider— (1) the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  *Compare* 18 U.S.C. § 3553(a) to 28 U.S. Code §§ 991 (United States Sentencing Commission; establishment and purposes) and 994 (Duties of the Commission).

As stated in 28 U.S.C. §§ 991 and 994, the Commission's purposes and duties are to support 18 U.S.C. § 3553(a)(2)'s goal: "the need for the sentence imposed…." *See* 28 U.S.C. §§ 991 and 994.  Neither code references 18 U.S.C. § 3553(a)(1), which undercuts the Commission's purported goal of the "advancement in knowledge of human behavior as it relates to the criminal justice process."  28 U.S.C. § 991(b)(1)(C).  This omission, or codified sleight of hand, is one of the reasons why the Guidelines are so skewed against disadvantaged defendants, and why Courts are not required to impose a sentence based on them.  *Pepper v. United States*, 562 U.S. at 501.

Post *Booker*, we can acknowledge that love, resources and expertise add to a person's prosperity and potential while starving a person of the same, subverts and

diverts who and what they can become.  This common sense is at the core of individualized sentencing.  And Mr. Romero-Melendez's upbringing was exceptionally hard.  And where and how he was raised also matters.  He was raised in extreme poverty in Mexico in a region that normalized prostitution.  Mexico is a country where 41.9% of the population lives in poverty.[17]  Poverty's causes are complex, but too often we gloss over the annexation of Texas and the Mexican American War, which resulted in Mexico losing almost half of its territory as major contributing factors.[18]  Systemic poverty has continued to push Mexican migration into the United States.[19]  And studies show that high percentages of undocumented Mexican immigrants suffer from depression or anxiety.[20]  Indeed, the PSR acknowledges this complex history as a mitigating factor this Court should consider in sentencing Mr. Romero-Melendez.[21]

Nevertheless, the Guidelines dogmatically assert that national origin and socioeconomic status "are not relevant in the determination of a sentence."  *See* § U.S.S.G. 5H1.10.   But the irony is that by ignoring this critical information, the Guidelines, in fact, call into question their own relevance.  This is precisely why courts must, therefore, be careful to guard against the "unintended anchoring effect that the

---

[17]*See The World Fact Book – Central Intelligence Agency*, *Population below the poverty line*, https://www.cia.gov/the-world-factbook/field/population-below-poverty-line.

[18]*See Mexican-American War*, https://www.history.com/topics/mexican-american-war/mexican-american-war; and *Mexican-American War,* https://en.wikipedia.org/wiki/Mexican%E2%80%93American_War.

[19]*See An Analysis Of Unauthorized Immigrants In The United States By Country And Region Of Birth*, https://www.migrationpolicy.org/research/analysis-unauthorized-immigrants-united-states-country-and-region-birth.

[20]*See Immigration, Stress, And Depressive Symptoms In A Mexican-American Community*, https://pubmed.ncbi.nlm.nih.gov/2307968/.

[21]*See* ¶ 236 ("the defendant is the product of a poverty-stricken part of Mexico, where sex trafficking is woven into the fabric of society.").

[G]uidelines can exert" leading to "irrationally assign[ing] too much weight to the guidelines range[] just because it offers some initial numbers." *United States v. Ingram*, 721 F.3d 35, 40 n.2 (2d Cir. 2013) (Calabresi, J., concurring) (internal quotation marks and citations omitted); *see generally* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" And "Blind Spot" Biases in Federal Sentencing: A Modest Solution For Reforming A Fundamental Flaw*, 104 J. Crim. L. & Criminology 489 (2014).

This discussion of Mr. Romero-Melendez's background and characteristics is not an excuse. As the Supreme Court case law and statutory authorities clarify, mitigation evidence is not permitted or presented as an excuse or justification for engaging in criminal conduct, but rather for mitigation of the length of sentence or type of punishment to be imposed. *See Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, 18 U.S.C. § 3661 and 21 U.S.C. § 850. As Justice O'Connor noted in her concurring opinion in *California v. Brown*, 479 U.S. 538 (1987), evidence about offenders' backgrounds and character is relevant because of the belief, held by this society, that people who commit criminal acts that are attributable to disadvantaged backgrounds, or emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *Id*. at 545. Accordingly, we respectfully ask for a variance.

**B.      Employment Record, Harsh Conditions, Health and Disparities**

As mentioned, Mr. Romero-Melendez has worked throughout his life.  Indeed, from 2015 through 2017, he was employed at Finley Automotive in North Carolina.[22] While an offender's employment record, under the Guidelines, is discouraged as a factor, *see United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990), it is a valid consideration for a variance.

We also ask the Court to consider that Mr. Romero-Melendez has been incarcerated in very harsh pretrial detention conditions, including the 2019 blackout and the COVID-19 Pandemic with its quarantines, lockdowns and no family visits.  *See*, *e.g.*, *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 (2d. Cir. 1996); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 181004, at *7, 8 (S.D.N.Y. Sep. 30, 2020).  As a result, "the actual severity of [the defendant's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."  *Id*. at *8.  *See also* Bureau of Prisons ("BOP")'s Modified Operations Plan,[23] and COVID-19, Coronavirus.[24]

Unfortunately, Mr. Romero-Melendez contracted COVID-19 in December 2020 and suffered painfully and still has side effects, and we ask that the Court take this into consideration for a variance.  *Cf. United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's medical condition and charitable and civic good deeds warranted downward departure).

---

[22]*See* employment verification letter, Government Exhibit 200-60, attached at Exhibit D.

[23]*See BOP, BOP Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp.

[24]*See* BOP, *COVID-19, Coronavirus*, https://www.bop.gov/coronavirus/.

Mr. Romero-Melendez also asks the Court to consider that in fiscal year 2018, the mean sentence for offenders convicted of sex abuse in federal courts was 191 months and the median sentence was 180 months.[25]  And in fiscal year 2018, the average sentence for defendants convicted of murder was 291 months and the median sentence was 292 months; while for kidnapping, the average and median sentences were 179 months and 138 months, respectively.  These ranges provide further reason to reject the mathematically driven sentence suggested by Probation's reliance on the Guidelines, and apply a variance to avoid an unwarranted sentencing disparity.  *See United States v. Florez*, 447 F.3d 145, 157 (2d Cir. 2006); and *United States v. Wills*, 476 F.3d 103, 110 (2007).

---

[25] *See U.S. Sentencing Comm'n, 2018 Sourcebook Of Federal Sentencing Statistics*, Table 15 (2018), https://www.ussc.gov/research/sourcebook/archive/sourcebook-2018.

**VI.    Conclusion**

We respectfully urge the Court to vary from the Guideline range based on the 18 U.S.C. § 3553(a) factors set forth in this memorandum and impose a sentence of 15 years followed by five years supervised release.

This is a significant penalty that amply punishes Mr. Romero-Melendez for his offense conduct, maintains and encourages respect for the administration of justice, and serves as individual and general deterrents.  It is, in short, a sufficient, but not greater than necessary sentence.

Mr. Romero-Melendez respectfully reserves the right to raise additional issues, if necessary, at the time of sentencing.

Dated:          Brooklyn, New York
                August 6, 2021

                                Respectfully submitted,


                                _____s/_____
                                MICHAEL O. HUESTON, ESQ.
                                *Attorney for Defendant*
                                16 Court Street, Suite 1800
                                Brooklyn, New York 11241
                                (718) 246-2900

                                JACQUELINE CISTARO, ESQ.
                                *Associate Counsel for Defendant*