# EXHIBIT A

# MICHAEL HUESTON
### ATTORNEY AT LAW

16 COURT STREET  
SUITE 1800  
BROOKLYN, NEW YORK 11241

Tel: (718) 246-2900  
Fax: (718) 246-2903  
Email: mhueston@nyc.rr.com

ADMITTED NY

December 15, 2020

**BY EMAIL**  
P.O. Patricia A. Sullivan  
United States Probation Department  
Eastern District of New York  
147 Pierrepont Street  
Brooklyn, New York 11201

Re:  *United States v. Melendez-Perez, et al.*, 17 Cr. 434 (ARR)

Dear Ms. Sullivan:

Jacqueline Cistaro and I represent Abel Romero-Melendez in this case.  This letter sets forth Mr. Romero-Melendez's objections, comments, and corrections to the October 19, 2020, Presentence Report.

**PART A.**

**The Offense Conduct**

We object to the characterization and factual assertions regarding Mr. Romero-Melendez's alleged involvement in the offense conduct attributed to him at ¶¶ 9-11, 16, 20, 21, 76, 78, and 81-88.

¶¶ 9-11 Background

Mr. Romero-Melendez was convicted on five counts: Count One (conspiracy to smuggle aliens between 2006 and July 2017) (8 U.S.C. § 1324(a)(1)(A)(v)(I), 8 U.S.C. § 1324(a)(1)(B)(i)); Count Two (conspiracy to transport minors between August 2006 and April 2014) (18 U.S.C. § 2423(e), 18 U.S.C. § 2423(a)); (3) Count Three (conspiracy to commit sex trafficking between January 2009 and July 2017) (18 U.S.C. § 1594(c), 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2)); (4) Count Four (trafficking Diana, a minor, between August 2006 and March 2007) (18 U.S.C. § 1591(a)(1), 18 U.S.C. § 1591(a)(2), 18 U.S.C. § 1591(b)(1) and 18 U.S.C. § 1591(b)(2)); and (5) Count Eighteen (illegal reentry) (8 U.S.C. § 1326(a)).

At ¶ 9, the report states: "Although not all of the defendants were involved with the [Melendez-Rojas trafficking organization ('MR-TO') for the entirely of the charged conspiracy, they were generally equal participants.  They all benefited financially from offenses, and they worked together to ensure the ongoing prostitution of the victims and money laundering of the proceeds."  We object to this characterization, and note that even the evidence adduced at trial

does not support this conclusion. *See generally*, Defendant's Motions pursuant to Fed. R. Crim. P. 29 and 33 at Docket, Documents Nos. 225, 233, which we incorporate by reference.

To give context to Mr. Romero-Melendez's alleged involvement in the offense, we stress that Cristina Sanchez Sanchez ("Sanchez"), who is referred to in the report as "Estephanie"and "Jane Doe # 8" and Lizbeth Castellanos Bautista ("Castellanos Bautista"), the women Mr. Romero-Melendez purportedly smuggled and sex trafficked, did not testify at trial. Further, the government did not bring substantive counts against him regarding these individuals. Except for Diana (Jane Doe # 1), Mr. Romero-Melendez was not charged with any substantive counts regarding the alleged victims. And of those only Diana, Delia (Jane Doe # 5), and Daisy (Jane Doe # 6) discussed Mr. Romero-Melendez, while Veronica (Jane Doe # 2), Fabiola M. (Jane Doe # 3), and Maria Rosalba (Jane Doe # 4) had little or nothing to say about him. Notably, at trial the government stipulated that in Delia's sworn statement to Mexican authorities she did not mention that Mr. Romero-Melendez or his sister, Alicia Romero-Melendez, were part of the sex trafficking ring. Trial Transcript ("Tr.") 972.

In addition, the government contended that its testimonial evidence was corroborated by other evidence, including evidence seized from an apartment associated with Mr. Romero-Melendez in Flushing, Queens pursuant to the execution of a search warrant. However, when the search warrant was executed Mr. Romero-Melendez was living in Charlotte, North Carolina. Tr. 1075, 1113, and GX 200 (Mr. Romero-Melendez's lease and lease records showed that he had lived in North Carolina since 2015).[1] Further, the presence of various bills, wire transfer records, "chica" cards, and notebooks in 2017 did not substantiate Diana's allegations against him from ten years earlier. In addition, the seized items did not corroborate that Mr. Romero-Melendez smuggled or forced women into prostitution, and the items were not apparent contraband. None of the individuals living in the residence, at the time of the execution of the search warrant, testified about the items.

¶¶ 16, 20, 21: Jane Doe #1 (Diana)

We note the following regarding the report's assertions about this individual.

Diana testified that she arrived at the United States-Mexican border with Jose Miguel Melendez-Rojas ("Miguel") and met up with Mr. Romero-Melendez and a woman named Carmen, and after numerous attempts, she and Miguel successfully crossed the border, while Mr. Romero-Melendez was detained and returned to Mexico. Tr. 1237, 1244, 1245. She claimed that she did not know what happened to Carmen. Tr. 1245. Diana testified that she had no contact with her own family, did not have a cellphone, and immediately traveled with Miguel to Rosalio Melendez-Rojas's apartment on Martense Avenue, Queens, New York. Tr. 1246, 1247, 1261. She claimed that a "**short time**" later Mr. Romero-Melendez arrived in Queens. Tr. 1262-1264 (emphasis added). She testified that the "**first night**" she worked as a prostitute, Miguel found money that she had hidden and believed she had been stealing from him, so he beat and raped her in front of Mr. Romero-Melendez and others. Tr. 1261, 1262 (emphasis added).

---

[1] "GX" refers to the 3500 material and exhibits referrenced in defendant's motions, pursuant to Fed. R. Crim. P. 29 and 33, at Docket, Documents Nos. 225, 233.

However, on cross-examination, Diana admitted that Mr. Romero-Melendez did not arrive in New York until "**three months**" after she and Miguel arrived in Queens. Tr. 1324 (emphasis added); *see also* GX 3500-Diana-7 and 7A. She further admitted that she knew Carmen went back to Veracruz, Mexico (which supports the inference that Mr. Romero-Melendez did not force women across the border or into prostitution). Tr. 1323; *compare* GX 3500-Diana-12 and 12A. Diana also admitted that she never told the government that anyone was present during any alleged rape and agreed it was an "extremely important detail" that she would have shared with the government in her proffers. Tr. 1323-1328; *compare also* GX-3500 Diana-7 and 7A. These contradictions show that her testimony was false regarding Mr. Romero-Melendez's presence when she was allegedly assaulted and raped.

Further, Sanchez's proffer statements to the government contradicted key points of Diana's testimony regarding Mr. Romero-Melendez. *Compare* GX 3500-Cristina-1 and 1A, 2 and 2A, and 3. In their meetings, Sanchez told the prosecution that she was born in late 1987, which belies the story Diana told about Mr. Romero-Melendez bragging that Sanchez was underage. *See also* GX 217 and GX 218; GXs 3500-Daisy-5-008 and 3500-Daisy-7-002 (showing Sanchez was born in December 1987). Sanchez also told the prosecution that Mr. Romero-Melendez did not return to Queens until November 2006, which is inconsistent with Diana's trial testimony. Indeed, wire records (GX 412 - portion at Exhibit B) show that Sanchez was in New York as early as February 2006, which again contradicts Diana's trial testimony.

On cross examination, we also showed that no one forced Diana to cross illegally into the United States from Mexico, and that in her prior meetings with the government she never said that Mr. Romero-Melendez helped her memorize a fake birth date. Tr. 1321, 1322.

### ¶ 76 Other Victims (Not Referenced in the Indictment) – Jane Doe # 8, Estephanie

At trial Diana claimed that she saw Mr. Romero-Melendez breaking up packets of condoms and "going over accounts" with Sanchez. Tr. 1265, 1266. However, on cross examination she admitted that in her proffer meetings she never told the agents that she witnessed any so-called "accounting" between Mr. Romero-Melendez and Sanchez. Tr. 1328. Daisy and Delia testified about their alleged observations regarding Sanchez's involvement in prostitution, but provided insufficient evidence to support the legal elements of the charged crimes. Tr. Tr. 264-276, 820-838.

Again, Sanchez did not testify at trial, and in the government's proffer notes she did not state that Mr. Romero-Melendez ever forced her into prostitution or trafficked her, or that he committed any crimes against her. *See* GX 3500-Cristina-1 and 1A, 2 and 2A, and 3. Accordingly, we object to the inclusion of this uncharged conduct in the computation of Mr. Romero-Melendez's Guidelines.

### ¶ 78  Money Laundering Activities

First, Mr. Romero Melendez was not charged with money laundering or distributing proceeds in this case.

3

Second, while Daisy testified that she was present when Mr. Romero-Melendez's sister, Alicia Romero-Melendez, wired money for him, Tr. 274, 275, the testimony did not further the convicted conduct or his alleged involvement in money laundering or distributing proceeds.

Third, the wire transfers are inconsistent with Mr. Romero-Melendez's involvement in money laundering or distributing proceeds. Indeed, the records of one woman, Lizbeth Castellanos Bautista showed that whatever money she sent, from whatever source, went not to Mr. Romero-Melendez, but to her apparent family members. *See* GX 412, portion at Exhibit A. Similarly, the wire records showed that the majority of the money sent by Sanchez, approximately $61,000, was to her presumed family members. GX 412, portion at Exhibit B; *see also* Tr. 1066 ("MS. KASSNER: Your Honor, the government is willing to stipulate that everyone who is not individually listed in the Government Exhibit 413 is listed as others. THE COURT: Everyone? MS. KASSNER: Everyone who is not individually segregated out is not. THE COURT: Who is not in the chart? MS. KASSNER: Yes."). The wired money sent to these two women's family members directly contradicts the government's theory that Mr. Romero-Melendez's "victims" were forced to remit their earnings to him and his co-conspirators.

### ¶¶ 81-88 The Defendants' Participation (Abel Romero-Melendez)

<u>Count 1, the Alien Smuggling Conspiracy</u>: We refer you to the comments regarding our factual objections. We agree that U.S.S.G. § 2L1.1 provides a base offense level 12 as per U.S.S.G. § 2 L1.1(a)(3). We object to the application of U.S.S.G. § 2L1.1(b)(2)(A) (3 levels) (smuggling of between 6 and 24 aliens); U.S.S.G. § 2L1.1(b)(4) (4 levels) (offense involved the smuggling of at least one minor); U.S.S.G. § 2L1.1(b)(7)(B) Application Note 4 of U.S.S.G. § 2L1.1 (4 levels) (serious bodily injury is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law); and U.S.S.G. §2L1.1(b)(8)(A) (2 levels) (victims kept in the United States by coercion and threats).

<u>Count 2, the Conspiracy to Transport Minors</u>: We refer you to the comments regarding our factual objections. We object to the application of the special instruction at U.S.S.G. § 2G1.3(d), which results in a guideline calculation being done for each of the following count groups: Counts 2, 3, and 4 with respect to Jane Doe # 1, and Count 3 with respect to Jane Doe # 8.

<u>Counts 2, 3, and 4 with respect to Jane Doe # 1</u>: We refer you to the comments regarding our factual objections. We agree that the convicted conduct references U.S.S.G. § 2G1.3. As for Count 2, as per U.S.S.G. § 2G1.3(a)(3), the base offense level is 28 (a conviction of 18 U.S.C. § 2423(a)); and as for Counts 3 and 4, as per U.S.S.G. § 2G1.3(a)(2) the baselines are 34 (a conviction of 18 U.S.C. § 1591(b)(1)) and 30 (a conviction of 18 U.S.C. § 1591(b)(2)) respectively. We object to the application of U.S.S.G. § 2G1.3(b)(2)(B) (2 levels) (defendant unduly influenced Jane Doe # 1 to engage in prohibited sexual conduct through threats of violence against her family, and physical assaults); U.S.S.G. § 2G1.3(b)(4)(A) (2 levels) (commission of sex acts and sexual contact); and U.S.S.G. § 3A1.1(b)(1) (2 levels) (vulnerable victims).

We note that your office determined that the cross reference found at U.S.S.G.§

2G1.3(c)(3) was considered since the offense involved criminal sexual abuse, but determined that the offense level resulting from the cross reference to U.S.S.G. § 2A3.1 was not greater than that determined above, so the cross reference was not utilized. However, we believe that Mr. Romero-Melendez's offense level for Count 2, as per U.S.S.G. § 2G1.3(a)(2), is only 28 (a conviction of 18 U.S.C. § 2422(b)), so U.S.S.G. § 2A3.1 would apply and result in an offense level of 30.

Count 3 with respect to Jane Doe #8: We refer you to the comments regarding our factual objections. We agree that this uncharged conduct references U.S.S.G. § 2G1.3, but object to its application. If applicable, U.S.S.G. § 2A3.1 would provide for a base offense level of 30, as per U.S.S.G. § 2A3.1(a)(2), and we would object to the application of U.S.S.G. § 2A3.1(b)(1) (4 levels) (abusive conduct); and U.S.S.G. § 3A1.1(b)(1) (2 levels) (vulnerable victims).

Count 18, Illegal Reentry: We agree that Illegal Reentry is referenced to U.S.S.G. § 2L1.2 and provides a base offense level 8.

**¶¶ 137, 226 Victim Impact (Abel Romero-Melendez); and Restitution at Part D. Sentencing Options**

We object and refer you to the comments regarding our factual objections concerning Jane Doe # 1 and Jane Doe # 8, and object to the imposition of restitution regarding Jane Doe # 8.

**Offense Level Computation; and Guideline Provisions at Part D. Sentencing Options**

We object to the offense level computation at ¶¶ 141-177, 213. We assert that the following is the correct Guideline calculation.

¶ 141: We agree that Counts 1 and 18 are grouped as per USSG § 3D1.2(d). We object to the application of the special instructions at U.S.S.G. §§ 2G1.1 and 2G1.3(d) regarding the grouping of Count 3 with respect to Jane Doe # 8.

¶¶ 143-151: Count 1: Alien Smuggling Conspiracy

Mr. Romero-Melendez's offense level is 12 as per U.S.S.G. §2L1.1(a)(3). We object to all of the enhancements.

¶¶ 152-164: Counts 2, 3[2], and 4: Sex Trafficking of Jane Doe #1

Mr. Romero-Melendez's offense level results in 34, since he was convicted under 18 U.S.C. § 1591(b)(1) with respect to Count 4. We object to the enhancements.

---

[2] We note that the indictment does not list Counts 3(a) or 3(b), and we object to this characterization.

5

As for "Count 3(b): Sex Trafficking of Jane Doe #8" we object to the inclusion of this conduct. However, if included, the offense level would be 30, as per U.S.S.G. § 2A3.1 (a)(2). We would object to the enhancements.

¶¶ 165-171: Count 18: Illegal Reentry

Mr. Romero-Melendez's offense level is 8 as per U.S.S.G. § 2L1.2.

¶¶ 171-174, 213: Multiple Count Adjustment, Combined Offense Level, Total Offense Level

Counts 1 and 8 result in 0.0 levels and Counts 2, 3 & 4 result in 1.0 levels for a total of 1.0 Unit as per § 3D1.4(a), (b) and (c). This results in a combined total offense level of 35, and a Guidelines level of 168 to 210 months of imprisonment.

**Part C. Offender Characteristics**

¶ 187: Mr. Romero-Melendez did not receive the referred to releases at the Metropolitan Detention Center, Brooklyn.

**Personal and Family Data**

¶¶ 189, 190: "Elisa" should be spelled "Alicia".

¶ 196: Mr. Romero-Melendez has been in federal custody since July 12, 2017. *See also* ¶ 204.

Sincerely,

s/ Michael Hueston

Jacqueline Cistaro
*Associate Counsel*

cc:   A.U.S.A. Erin Argo
      A.U.S.A. Tanya Hajjar
      A.U.S.A. Gillian Kassner